**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| RICHARD PHILLIPS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CLEAR SPRING LIFE AND ANNUITY COMPANY; GAINBRIDGE LIFE INSURANCE COMPANY; MARK R. WALTER; DANIEL J. TOWRISS; FANG LINDA WANG; MICHAEL S. BLOOM; and ELLYN M. NETTLETON,<br><br>Defendants. | Case No. 1:26-cv-2215<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by and through counsel, alleges the following against Defendants. Plaintiff makes allegations concerning himself and his own acts on personal knowledge. Plaintiff makes all other allegations on information and belief, based on counsel's investigation, including a review of annual statements filed with the National Association of Insurance Commissioners ("NAIC") and the Indiana and Delaware Departments of Insurance, examination reports of the Delaware Department of Insurance, statutory financial statements filed with state insurance regulators, ratings-agency publications, and other published reports.

## SUMMARY OF THE CASE

1. An annuity is a contract between a buyer and an insurance company: the buyer pays the insurance company today for its promise to pay income regularly, beginning immediately or at a future date and continuing for a set period or the buyer's life. Unlike an FDIC-insured bank

deposit or a defined-benefit pension plan insured through the Pension Benefit Guaranty Corporation, that promise is not federally insured. An annuity's price and the value of the terms offered—including the credited interest rate, participation rate, rider fees, and guarantees—depend on the quality and risk of the assets supporting it, including the insurer's general account.

2. For fixed annuities (which guarantee that money put into the annuity will earn at least a minimum interest rate set by the insurer, creating a predictable income stream) and fixed-indexed annuities (which earn interest based on changes in a market index, may be capped at the high end, and are guaranteed never to earn less than zero, and thus offer guaranteed income and some protection against inflation), the insurer's general account, or the pool of invested assets from which the insurer pays every guaranteed obligation, guarantees the annuities' returns and income streams.

3. Key guarantees an insurer makes for such annuities—including guaranteed interest rates, minimum guaranteed interest rates, monthly annuity payments (once annuitized), guaranteed minimum values, and death benefits—all create general-account obligations. The general account's quality is therefore material to purchasers of fixed and fixed-indexed annuities and, in particular, to the price they pay. When an insurer misrepresents the financial condition of the general account underlying the annuities it issues and sells, buyers do not receive the safe annuity they were contractually promised; they overpay for a riskier, less valuable annuity contract. That is exactly what Clear Spring and Gainbridge did here.

4. This action alleges that Defendants Clear Spring Life and Annuity Company (doing business as Clear Spring Life and Annuity Insurance Company in California) ("Clear Spring") and Gainbridge Life Insurance Company ("Gainbridge") sold fixed and fixed-indexed annuities to Plaintiff and proposed class members and received payments for those annuities. Clear Spring and

Gainbridge are insurance companies under the umbrella of Group 1001 Insurance Holdings, LLC ("Group 1001"), which itself is held and controlled through an intricate chain of ownership by Defendant Mark R. Walter ("Walter"), the owner of the Los Angeles Dodgers, CEO of Guggenheim Partners, and CEO and co-chairman of TWG Global, LLC.

5. Clear Spring and Gainbridge sold these annuities and accepted payments from Plaintiff and the proposed class based on representations and promises regarding the financial strength and composition of their respective general accounts backing those annuities. Specifically, Clear Spring and Gainbridge represented in statutorily mandated annual statements filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators, and sworn to and attested by their officers (the "Signatory Officer Defendants"), that related-party investments constituted approximately **4% to 9%** of Clear Spring's general account assets in 2024-2025, and approximately **1.7%** of Gainbridge's general account assets in 2025.

6. These annual statements were false. As both Clear Spring and Gainbridge have now admitted, related-party investments made up between **45.5% and 47.8%** of the invested assets in Clear Spring's general account in 2024-2025 and approximately **15.7%** of the assets in Gainbridge's general account in 2025.

7. In the disclosures, statutorily required annual statements, and contracts that Clear Spring and Gainbridge provided to the Delaware and Indiana Departments of Insurance, the NAIC, other state insurance regulators, and consumers, the insurers concealed a critical fact: they did not use the premiums that Plaintiff and class members contributed for safe, independent investments that benefit annuitants (as Clear Spring and Gainbridge marketing and brochures represented), but instead funneled them into loans and financing for companies related to or controlled by Walter.

8. Those investments included billions of dollars of "private credit obligations"—privately negotiated loans and structured investments—in the form of non-arm's-length loans to other Walter-controlled businesses. In other words, the general accounts containing the premiums Plaintiff and class members paid for annuities promising "safe" returns and future income were diverted from the independent, investment-grade fixed-income securities in which the annual statements represented they were invested and placed instead in inherently riskier businesses related to Walter.

9. Both Clear Spring and Gainbridge have conceded that they made misstatements and omissions regarding related-party investments in their 2024 and 2025 annual statements to insurance regulators. In filings dated June 30, 2026, both disclosed that reviews of their related-party transactions "identified errors relating to the identification and presentation of certain related-party investments" and that they had restated prior disclosures for fiscal years 2024 and 2025 to correct those errors.

10. For Clear Spring, the June 2026 correction increased reported related-party investments for year-end 2024 from approximately $1.1 billion to over $5.9 billion and for year-end 2025 from approximately $486 million to more than $5.5 billion. The incremental amount—over $5 billion—consisted of private-credit investments whose returns were, in the Company's own formulation, *predominantly contingent on the performance of affiliates*. Indeed, the $5.5 billion in related-party exposure at the end of 2025 was nearly five times larger than Clear Spring's $1.2 billion in reported capital surplus at year-end 2025.

11. For Gainbridge, the June 2026 correction increased reported related-party investments for year-end 2024 from approximately $11.2 million to over $45.3 million and for year-end 2025 from approximately $28.6 million to over $268.7 million. As with Clear Spring,

Gainbridge's incremental $240.1 million restatement consisted of private-credit investments that were predominantly contingent on the performance of affiliates. The $268.7 million in related-party investments for year-end 2025 represented approximately 85.6% of Gainbridge's $314 million in reported capital surplus.

12. Clear Spring and Gainbridge did not correct their 2024 and 2025 annual statements in the ordinary course of business. They did so only after the government began investigating Walter and the Group 1001 insurers, including Clear Spring, Gainbridge, and Delaware Life and Annuity Company ("Delaware Life"). In September 2025, federal agents served Walter with a search warrant on his private plane at Chicago Midway International Airport and seized his phone and laptop, along with devices belonging to employees aboard the flight. In early February 2026, the United States Attorney's Office for the Southern District of New York served Delaware Life and Clear Spring with grand jury subpoenas while the Securities and Exchange Commission conducted a parallel investigation. Both investigations remain pending, and neither has resulted in charges. According to public reports, a whistleblower complaint triggered the investigations.

13. The falsity did not begin in 2024. As detailed further in this Complaint, Clear Spring and Gainbridge have falsely reported related-party investments held in their respective general accounts as "unaffiliated" in annual statements going back to at least 2017.

14. Furthermore, public reporting by financial media indicates that Clear Spring, Gainbridge, and their agents—including their common investment manager, Guggenheim Partners Investment Management, LLC, which is also controlled by Walter—may have used so-called "cutouts," or nominally independent third parties, to conceal investments in Walter's related-party ventures. Such arrangements would create the false appearance for regulators, rating agencies, and

investors that Clear Spring's and Gainbridge's general-account funds had instead been invested with independent third parties.

15. Plaintiff's counsel's investigation has discovered tens of millions of dollars of general-account investments issued by Amistad Financial, Bradford Allen, and Hudson Trading Inc.—identified in those financial media reports as among the potential "cutout" entities being investigated by federal investigators—that have appeared on Clear Spring's and Gainbridge's annual statements as unaffiliated going back as far as 2017. In state insurance regulatory filings for the first and second quarters of 2026, Clear Spring and Gainbridge seemingly confirmed these were improper "cutout" investments, disclosing that some previously-designated "unaffiliated" investments issued by Bradford Allen, Amistad Financial, and Hudson Trading Inc. held in their respective general accounts were, in fact, "affiliated" related-party investments.

16. The misstatements, omissions, and efforts to conceal facts in the 2024 and 2025 annual statements—as well as earlier annual statements—regarding the true extent of related-party investments held in Clear Spring's and Gainbridge's general accounts were material, incorporated into the annuity contracts as a matter of law, breached the promises made to annuity purchasers regarding the quality of Clear Spring's and Gainbridge's respective general accounts, and directly affected the price Plaintiff and class members paid for their annuities. Simply put, Clear Spring and Gainbridge breached their contract with Plaintiff and the class because they did not deliver an annuity with the credit and risk characteristics of an insurer with minimal related-party investments as promised.

17. Related-party investments are not economically equivalent to independent investments of nominally comparable credit quality, for which parties negotiate price and interest rates at arm's length subject to market forces. As state insurance regulators (including the Indiana

and Delaware Departments of Insurance), the NAIC, rating agencies, and Clear Spring and Gainbridge themselves recognize, their related-party nature makes them less sound and less likely to reflect market prices and terms accurately. Tellingly, both insurers adopted remediation plans to reduce related-party exposure shortly after disclosing the excessive related-party investments in their general accounts.

18. Had state regulators, such as the Indiana and Delaware Departments of Insurance, known that Clear Spring and Gainbridge, with the approval of Walter and the Signatory Officer Defendants, were misrepresenting related-party investments in their annual statements and using "cutouts" to conceal related-party investments, those regulators would have barred the companies from selling annuities to consumers such as Plaintiff and the class members. Likewise, if Plaintiff and the class members had known the truth about the share of related-party investments in Clear Spring's and Gainbridge's general accounts, they would have paid less for their annuities, received higher interest rates to compensate them for the additional risk, or purchased annuities from a different insurer entirely.

19. In a market where premiums, rates, fees, and guarantees are published, compared, and competitively bid, a purchaser who knew that over forty-five percent of the assets in Clear Spring's general account and nearly sixteen percent of the assets in Gainbridge's general account consisted of loans whose repayment depended on ventures related to Walter would have demanded a lower premium, a higher credited rate, a higher participation rate, a lower rider charge, a larger guarantee, or some combination of those terms—or would have bought from a different insurer entirely. By delivering an annuity that was riskier than what had been represented, Clear Spring and Gainbridge breached their contract with Plaintiff and the Class. The difference between what

the Class paid for the annuities as promised, and what a fully informed market would have paid for the annuities as actually structured measures the Class's injury.

20. Plaintiff brings this action on behalf of a class of all persons and entities who purchased, acquired, or made a payment toward a fixed annuity (including but not limited to a multi-year guaranteed annuity) or fixed-indexed annuity issued by Clear Spring Life and Annuity Company (or its predecessor Guggenheim Life and Annuity Company) or Gainbridge Life Insurance Company during the period from July 1, 2016, through June 30, 2026 (the "Class Period"). Fixed annuities (including multi-year guaranteed annuities) and fixed-indexed annuities are neither securities nor covered securities within the meaning of the Securities Litigation Uniform Standards Act.

21. Plaintiff and the proposed Class assert claims and seek damages or rescission of their annuity contracts with Clear Spring and Gainbridge for breach of contract and breach of the implied covenant of good faith and fair dealing. Their damages are measured by the difference between (i) the value of the annuities at the premiums Plaintiff and the Class paid and (ii) the inferior value of those annuities and/or the lower premium that would have been required to purchase the annuities had the related-party nature of Clear Spring's and Gainbridge's general accounts been disclosed as required. Alternatively, Plaintiff and the proposed Class assert claims for unjust enrichment against Clear Spring, Gainbridge, and Walter.

22. Plaintiff and the proposed Class also assert a claim and seek treble damages against Clear Spring, Gainbridge, Walter, and the Signatory Officer Defendants for violating the Indiana Crime Victims Relief Act ("ICVRA") (Ind. Code § 34-24-3-1). Plaintiff and the proposed Class allege that they suffered pecuniary losses as a result of Defendants' criminal conduct, specifically fraud under Ind. Code § 35-43-5-4. Defendants, with the intent to obtain annuity premiums from

Plaintiff and the proposed Class for Clear Spring and Gainbridge, made false and misleading statements in written, sworn, and filed mandatory annual statements that created a false impression among government insurance regulators, ratings agencies, and annuitants that Clear Spring's and Gainbridge's general accounts held only *de minimis* amounts of related-party investments, and were therefore financially sound and of comparable quality to that of insurers with higher credit quality due to their general accounts being held in independent, investment-grade investments. Instead, Clear Spring and Gainbridge had significant portions of their general accounts invested in riskier, related-party transactions that made the general accounts of the insurer far riskier than what Plaintiff and the Class had paid for and been promised.

## PARTIES

### I. Plaintiff

23. Plaintiff Richard Phillips is a citizen of the State of California, residing in Palos Verdes Estates, California. On January 8, 2024, Plaintiff Phillips purchased a Preserve Multi-Year Guaranteed Annuity (with a Guaranteed Interest Rate Period of 5 years during which the Guaranteed Interest Rate was 5.90% per year) issued by Clear Spring for an initial premium amount of $11,059.61. The contract was issued by Clear Spring Life and Annuity Insurance Company from Indianapolis, Indiana, and that it was "[s]igned for Clear Spring Life and Annuity Insurance Company at its office in Indianapolis, Indiana" by Clear Spring's President Daniel J. Towriss and Secretary Stephen M. Coons.

24. On or about March 8, 2024, Plaintiff Phillips purchased a SteadyPace Single Premium Individual Deferred Annuity (with a Guaranteed Interest Rate Period of 3 years during which the Guaranteed Interest Rate was 5.55% per year) issued by Gainbridge for an initial premium of $5,220. The contract stated it was being issued by Gainbridge Life Insurance Company from Indianapolis, Indiana, and that it was "[s]igned for Gainbridge Life Insurance Company at

its office in Zionsville, Indiana" by Gainbridge President Daniel J. Towriss and Secretary Stephen M. Coons.

25. On or about March 25, 2024, Plaintiff Phillips purchased a SteadyPace Single Premium Individual Deferred Annuity (with a Guaranteed Interest Rate Period of 3 years during which the Guaranteed Interest Rate was 5.55%) issued by Gainbridge for an initial premium of $7,540.92. The contract stated it was being issued by Gainbridge Life Insurance Company from Indianapolis, Indiana, and that it was "[s]igned for Gainbridge Life Insurance Company at its office in Zionsville, Indiana" by Gainbridge President Daniel J. Towriss and Secretary Stephen M. Coons.

26. On or about May 9, 2024, Plaintiff Phillips purchased a SteadyPace Single Premium Individual Deferred Annuity (with a Guaranteed Interest Rate Period of 5 years during which the Guaranteed Interest Rate was 6.15%) issued by Gainbridge for a premium of $100,000. The contract stated it was being issued by Gainbridge Life Insurance Company from Indianapolis, Indiana, and that it was "[s]igned for Gainbridge Life Insurance Company at its office in Zionsville, Indiana" by Gainbridge President Daniel J. Towriss and Secretary Stephen M. Coons.

27. Plaintiff did not receive annuities with the credit and risk characteristics for which he had contracted with Clear Spring and Gainbridge. Plaintiff's annuities were worth materially less than the annuities he had contracted to purchase because they were materially riskier than promised and/or because the insurers would have had to pay more in annuity payments or interest had they disclosed the annuities' true nature to Plaintiff before he paid the premiums. Clear Spring and Gainbridge breached their contracts with Plaintiff by delivering annuities inferior to the ones they promised him.

28. Plaintiff would not have purchased these annuities, would not have paid as much for these annuities, and/or would have received substantially higher annuity payments or interest rates had Clear Spring, Gainbridge, Walter, and the Signatory Officer Defendants disclosed the true related-party concentration and financial condition of their respective general accounts in sworn, mandatory annual statements filed with the NAIC, Indiana and Delaware Departments of Insurance, and other state insurance regulators.

## II. Defendants

29. Defendant Clear Spring Life and Annuity Company (formerly known as Guggenheim Life and Annuity Company, d/b/a Clear Spring Life and Annuity Insurance Company in California) (NAIC #83607) is a Delaware-domiciled insurance company with its registered office at 1209 Orange Street, Wilmington, Delaware, and its administrative offices and headquarters at 10555 Group 1001 Way, Zionsville, Indiana. It is licensed in forty-nine states (all but New York), the District of Columbia, and Puerto Rico. Clear Spring issues fixed annuities (sometimes referred to as multi-year guaranteed annuities) and fixed-indexed annuities for sale to consumers. As of June 30, 2026, it reported total admitted assets of approximately $15.2 billion, and total capital and surplus of approximately $1.1 billion. The filings of false annual statements for Clear Spring that form the basis of claims against Clear Spring occurred in Indiana.

30. Defendant Gainbridge Life Insurance Company (NAIC #15691) is a Delaware-domiciled insurance company with its registered office at 1209 Orange Street, Wilmington, Delaware, 19801, and its administrative offices and headquarters at 10555 Group 1001 Way, Zionsville, Indiana. It is licensed in forty-nine states (all but New York) and the District of Columbia. Gainbridge issues fixed annuities (sometimes referred to as multi-year guaranteed annuities) and fixed-indexed annuities for sale to consumers. As of June 30, 2026, it reported total admitted assets of approximately $1.87 billion, and total capital and surplus of approximately

$316.7 million. The filings of false annual statements for Gainbridge that form the basis of claims against Gainbridge occurred in Indiana.

31. Defendant Mark R. Walter is the ultimate controlling person of Clear Spring and Gainbridge. Clear Spring's and Gainbridge's annual statements state that "Mark R. Walter, an individual, is the ultimate controlling person of the Group 1001 Insurance holding company system" that includes Clear Spring and Gainbridge. Mr. Walter is also the chief executive of Guggenheim Partners' asset-management business and the founder, CEO, and chairman of TWG Global, LLC, through which he holds interests in numerous ventures outside the insurance business, including real estate, the Los Angeles Dodgers, the WNBA's Los Angeles Sparks, the Professional Women's Hockey League, TWG Motorsports, and (until recently) the English Premier League soccer team Chelsea F.C. and the Los Angeles Lakers. On information and belief, Mr. Walter is a resident of Illinois. However, the filings of false annual statements for Clear Spring and Gainbridge that form the basis of claims against him in his role as their ultimate controlling person occurred in, were caused by actions taken in, and directed from Indiana.

32. Defendant Daniel J. Towriss serves as Chief Executive Officer of both Clear Spring and Gainbridge, and previously served as President of both. In these roles, Mr. Towriss has signed annual statements filed with the NAIC and the Indiana and Delaware Departments of Insurance for both Clear Spring and Gainbridge in which he swore "to the best of [his] information, knowledge, and belief" that the annual statements were a "full and true statement of all the assets and liabilities and of the condition and affairs" of Clear Spring and Gainbridge and that the annual statements were "completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices

and procedures.” Upon information and belief, Mr. Towriss holds a direct minority equity interest in the holding-company structure that owns both Clear Spring and Gainbridge. The Delaware Department of Insurance reported that Mr. Towriss held an 8.11% economic and voting membership interest in Group One Thousand One, LLC, the predecessor parent of Group 1001, Inc. According to the annual statements at issue in this case, Group 1001, Inc. (which owns Clear Spring and Gainbridge via Group 1001 Insurance Holdings, LLC and CSLIC Holdings, LLC) was 91.89% owned within the Walter-related chain alleged below. On information and belief, Mr. Towriss is a resident of Florida, but owns real property in Indiana. Mr. Towriss was an officer responsible for the investment and reporting of the general-account assets of Clear Spring and Gainbridge, and the filings of false annual statements for Clear Spring and Gainbridge that he signed that form the basis of claims against him occurred in, were caused by actions taken in, and directed from Indiana.

33. Defendant Fang Linda Wang serves as Chief Financial Officer and President of both Clear Spring and Gainbridge. In these roles, Ms. Wang signed annual statements filed with the NAIC and the Indiana and Delaware Departments of Insurance for both Clear Spring and Gainbridge in which she swore “to the best of [her] information, knowledge, and belief” that the annual statements were a “full and true statement of all the assets and liabilities and of the condition and affairs” of Clear Spring and Gainbridge and that the annual statements were “completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures.” On information and belief, Ms. Wang is a resident of Massachusetts. Ms. Wang was an officer responsible for the investment and reporting of the general-account assets of Clear Spring and

Gainbridge, and the filings of false annual statements for Clear Spring and Gainbridge that she signed that form the basis of claims against her occurred in, were caused by actions taken in, and directed from Indiana.

34. Defendant Michael S. Bloom serves as Chief Legal Officer and Secretary of both Clear Spring and Gainbridge. In these roles, Mr. Bloom signed annual statements filed with the NAIC and the Indiana and Delaware Departments of Insurance for both Clear Spring and Gainbridge in which he swore "to the best of [his] information, knowledge, and belief" that the annual statements were a "full and true statement of all the assets and liabilities and of the condition and affairs" of Clear Spring and Gainbridge and that the annual statements were "completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures." On information and belief, Mr. Bloom is a resident of New Hampshire. Mr. Bloom was an officer responsible for the investment and reporting of the general-account assets of Clear Spring and Gainbridge, and the filing of false annual statements for Clear Spring and Gainbridge that form the basis of claims against him occurred in, were caused by actions taken in, and directed from Indiana.

35. Defendant Ellyn M. Nettleton serves as Chief Accounting Officer for both Clear Spring and Gainbridge. In these roles, Ms. Nettleton signed annual statements filed with the NAIC and the Indiana and Delaware Departments of Insurance for both Clear Spring and Gainbridge in which she swore "to the best of [her] information, knowledge, and belief" that the annual statements were a "full and true statement of all the assets and liabilities and of the condition and affairs" of Clear Spring and Gainbridge and that the annual statements were "completed in

accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures." On information and belief, Ms. Nettleton is a resident of Indiana. Ms. Nettleton was an officer responsible for the investment and reporting of the general-account assets of Clear Spring and Gainbridge, and the filings of false annual statements for Clear Spring and Gainbridge that form the basis of claims against her occurred in, were caused by actions taken in, and directed from Indiana.

36. Collectively, Towriss, Wang, Bloom, and Nettleton are referred to as the "Signatory Officer Defendants."

## III. Other Relevant Persons and Entities

37. TWG Global, LLC, TWG Financial Holdings, LLC, Group 1001, Inc., Group 1001 Insurance Holdings, LLC, and CSLIC Holdings, LLC are Delaware entities that constitute the chain of ownership and control between Walter and Clear Spring and Gainbridge, as set forth below.

38. Guggenheim Partners Investment Management, LLC ("GPIM") is a Delaware limited liability company and a registered investment adviser. GPIM's sole owner is Guggenheim Capital, LLC, through a series of holding companies, including Guggenheim Manager, Inc.; Guggenheim Partners, LLC; GI Holdco II LLC; GI Holdco LLC; GMI GPIMH, LLC; GIH Borrower, LLC; GIH Parent, LLC; Guggenheim Investments Holdings, LLC, and Guggenheim Partners Investment Management Holdings, LLC. Mark Walter is the CEO and controlling person of Guggenheim Capital, and therefore of GPIM. Since December 17, 2009, GPIM has provided investment management services to Clear Spring under an Investment Management Agreement.

Since at least October 6, 2025, GPIM has provided "investment management services for certain of" Gainbridge's investments pursuant to an Investment Management Agreement.

39. Insurance Management Services, LLC ("IMS"), formerly named Guggenheim Insurance Services, LLC, is a Delaware limited liability company. IMS is a wholly owned subsidiary of TWG Financial Holdings, LLC, which is a wholly owned subsidiary of TWG Global, LLC (which is controlled by its CEO, Mark Walter). Since January 1, 2013, IMS has provided "certain personnel, facilities, systems, and equipment in conjunction with the provision of accounting and general services, and other advisory services" to Clear Spring. Clear Spring reported paying IMS approximately $25 million annually in both 2024 and 2025 for these services.

## IV. Walter's Control of Clear Spring and Gainbridge Through TWG Global

40. As reported by the Delaware Department of Insurance as of June 30, 2026, the relevant chain of ownership and control of Group 1001, Clear Spring, and Gainbridge is as follows:

a. Mark R. Walter owns 100% of DLICM, LLC and 100% of DLHPII Equity Participation Company, LLC.

b. DLICM, LLC, in turn, holds 72.92% of TWG Global, LLC, while DLHPII Equity Participation Company, LLC holds the remaining 27.08% of TWG Global, LLC.

c. TWG Global, LLC holds 100% of TWG Financial Holdings, LLC.

d. TWG Financial Holdings, LLC holds 91.89% of Group 1001, Inc. and 100% of Insurance Management Services, LLC. On information and belief, Daniel J. Towriss holds the other 8.11% of Group 1001, Inc.

e. Group 1001, Inc. holds 100% of Defendant Group 1001 Insurance Holdings, LLC.

f. Group 1001 Insurance Holdings, LLC holds 100% of CSLIC Holdings, LLC.

g. CSLIC Holdings, LLC holds 100% of Defendant Clear Spring Life and Annuity Company (formerly Guggenheim Life and Annuity Company).

h. Clear Spring Life and Annuity Company holds 100% of Defendant Gainbridge Life Insurance Company.

41. In other words, TWG Global, LLC is both the common parent of Clear Spring and Gainbridge and the entity through which Walter owns interests in other, non-insurance business ventures. Loans, investments, and extensions of credit from Clear Spring's and Gainbridge's general accounts to non-insurance enterprises owned or controlled by TWG Global and/or Walter were therefore transactions between related parties under common control and with common interests.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction over the claims asserted pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, the proposed Class comprises more than one hundred members, and at least one member of the proposed Class is a citizen of a State different from Defendants.

43. This Court has personal jurisdiction over Clear Spring and Gainbridge, both of which are headquartered within this district in Zionsville, Indiana. This Court has personal jurisdiction over all Defendants because the filings of false annual statements for Clear Spring and Gainbridge that form the basis of claims against all Defendants occurred in, were caused by actions taken in, and directed from Indiana.

44. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred here, specifically the creation, preparation, and filing of false annual statements with the NAIC, the Indiana and Delaware Departments of Insurance, and other state regulators. Venue is also proper because Clear Spring and Gainbridge are headquartered here and are subject to personal jurisdiction in this District, and

because the actions of all Defendants relevant to the underlying claims were directed at, occurred from, or were carried out in this District, where Clear Spring and Gainbridge were headquartered.

## DETAILED ALLEGATIONS

### I. Background on Annuities

#### A. The Annuity Model

45. An annuity is a contract under which a buyer purchases an insurance company's promise to pay the buyer and/or the buyer's designated beneficiary income regularly for a period chosen by the buyer, including the rest of the buyer's and/or the designated beneficiary's life. Some annuities pay income soon after purchase (immediate annuities), while others begin payments on a later date chosen by the purchaser (deferred annuities).

46. For an immediate annuity, the purchaser pays a lump-sum premium to the insurer, which then pays the purchaser and/or beneficiary an agreed amount of income for an agreed period. Those payments may continue for years, decades, or for the rest of the purchaser's life, the beneficiary's life, or both. Optional riders can provide additional benefits, for an additional price, such as cost-of-living adjustments to the income stream, joint-life coverage (meaning that payments continue until both spouses die), and/or a "guarantee period" during which payments will be made even if the annuitant or annuitants die before the guarantee period ends.

47. Deferred annuities, which are the annuities that Clear Spring and Gainbridge sold, have an accumulation period and a payout period. They are "deferred" because payments do not begin shortly after purchase. During the accumulation period, the buyer pays premiums or contributions to the insurer—sometimes in a single lump sum at purchase and sometimes over time—and the annuity's value changes based on its type and the interest or returns credited. The accumulation period may last years or decades, during which the buyer contributes funds and/or receives interest or returns before receiving payments.

48. At the annuity date (the date upon which the annuitant elects to begin payments under an annuity option in the contract) or the maturity date (the latest permitted annuity date, at which payouts are required to begin), a deferred annuity begins its payout period. During the payout period, the value of the deferred annuity is annuitized, and the insurer makes payouts to the buyer or beneficiary. As with an immediate annuity, the payout period may last years or decades, or the rest of the buyer's or beneficiary's life.

49. Deferred annuities also offer a basic death benefit. If the buyer or beneficiary of a deferred annuity dies during the accumulation period or prior to the annuity date/maturity date, the annuity's basic death benefit—usually the greater of the annuity account value or the minimum guaranteed surrender value—is paid to survivors or designated beneficiaries, either in one payment or in multiple payments over time. No payment is made to a chosen survivor if the annuity recipient dies after annuitizing and begins receiving income payments, unless the contract guarantees payment of at least the amount contributed or provides a payout option that continues payments after death for some set period of time. Riders can enhance the basic death benefit by guaranteeing survivors a higher payout at additional cost.

50. Money earned by a deferred annuity is also tax-deferred, meaning income taxes on earnings are not paid until the earnings are withdrawn from the annuity.

51. Relevant to this lawsuit are two specific types of deferred annuities: fixed annuities and fixed-indexed annuities. [1]

52. A fixed annuity (sometimes also referred to as a multi-year guaranteed annuity, or MYGA) guarantees a specific rate of return on the purchaser's contributions during the

---

[1] A third type of deferred annuity—a variable annuity—is considered a security under federal securities law, and is not at issue in this case.

accumulation period, with the insurer's general account supporting that guarantee. The insurance company assumes all investment risk, and the contract holder receives a predictable return during that period. The interest rate is typically declared in advance for a guaranteed interest rate period (e.g., 3% for five years) and may reset periodically. Fixed annuities are generally considered the most conservative option because they offer principal protection and predictable returns but limited upside potential.

53. A fixed-indexed annuity is a hybrid between a fixed annuity and a variable annuity. It credits interest on contributions during the accumulation period based on the performance of a market index (e.g., the S&P 500) but typically includes a floor—often 0%—so the contract holder does not lose principal in a downturn. In exchange for that downside protection, guaranteed by the insurer's general account, gains are usually subject to a cap, participation rate, or spread that limits the upside. For example, a contract might credit 80% of the index's gain, up to a 10% cap, over a designated period of time. The insurance company bears the risk of loss below the floor during the accumulation phase.

54. Fixed and fixed-indexed annuities frequently require customers to pay a charge—called a surrender charge or withdrawal charge—if they take out some or all of their money before a set time period ends. Such annuities can also decrease the surrender/withdrawal charge across a specified period of time on a specified schedule, or permit the annuitant to take up to a specified percentage of their account balance without assessing the surrender/withdrawal charge based on the time invested and a contracted-to schedule.

55. Fixed and fixed-indexed annuities also may have market value adjustments, which can decrease (or, in rare cases, increase) the annuity's account value, cash surrender value, or death

benefit value if the annuitant withdraws money from the account, fully surrenders the contract, or annuitizes the contract before the end of a guaranteed interest rate period.

56. The Clear Spring and Gainbridge annuities at issue in this lawsuit had surrender/withdrawal charges and market value adjustments. These charges and adjustments functioned to create substantial penalties for any annuitants who wished to withdraw their funds early, and deterred annuitants from achieving any rescission of their contract and return of their full premiums when, as here, they discovered the annuities they were sold were not as safe as promised.

57. When a purchaser buys a fixed or fixed-indexed annuity, the insurer takes the premium into its general account and assumes a long-dated obligation to pay principal, credited interest, and, after annuitization, guaranteed income payments for the period the purchaser chooses or for life. The insurer backs the annuity (including guaranteed interest rates, guaranteed floors on losses, contracted annuity payment rates once the deferred annuity is annuitized or reaches its maturity date, and guaranteed periods of payments) with its general account and general credit.

58. An insurer's general account and general credit also back certain other guarantees routinely provided with and under an annuity—including death benefits, living benefits, and guaranteed minimum values.

59. In the case of immediate annuities and fixed/fixed-indexed deferred annuities, the purchaser's security in the returns earned during the accumulation period and the income stream promised and paid during the payout period depends on the adequacy, quality, diversification, and independence of the insurer's general-account assets. In other words, annuity purchasers seek an insurer that is financially sound.

60. For that reason, the financial strength of the issuing insurer's general account is central to the bargain. Purchasers rely on the insurer's reported statutory surplus, risk-based-capital position, and financial-strength ratings (such as those published by S&P Global and AM Best) in deciding whether to entrust their savings to the insurer and at what price. All of this information comes from, is derived from, or relies upon the accuracy of sworn, mandatory annual statements to the NAIC and state insurance regulators.

### B. State Insurance Laws and NAIC-Mandated Statutory Accounting for Annuities Exist to Protect Policyholders

61. The information consumers and ratings agencies use to assess an insurer's financial strength and soundness comes from the insurer's annual financial statements regarding its general account, which the law of every state in which the insurer sells annuities requires. An insurer that appears strong, diversified, and independent can sell more annuities and command better pricing than one whose assets are riskier because they are concentrated in related-party, illiquid, self-dealing investments.

62. Because solvency is paramount, insurers do not report on the same basis as ordinary companies. They report on a conservative, solvency-focused basis known as Statutory Accounting Principles ("SAP"), codified in the NAIC Accounting Practices and Procedures Manual and adopted by the states, including Indiana, where Clear Spring and Gainbridge are headquartered, and Delaware, where they are domiciled. SAP is deliberately conservative and designed to give regulators and the public an accurate, non-inflated picture of an insurer's ability to pay claims.

63. Only insurers licensed by a state's insurance department and compliant with state insurance regulations (including the Indiana regulations mentioned below) may sell a fixed or fixed-indexed annuity, and the insurer must sell it pursuant to a contract and disclosure document

describing the annuity's key features, including what is guaranteed, what is not guaranteed, and what fees and charges apply.

64. Each insurer must file with the insurance regulators of every State in which it does business an annual statement sworn to by its officers. Those statements report, among other things, the insurer's admitted assets, its investments by schedule and type, its surplus, the inputs to its risk-based capital, and—key to this lawsuit—its transactions with related parties. The statements are public, relied upon by investors and rating agencies, and are the foundation of the financial-strength representations on which annuity purchasers rely.

65. Insurers doing business in Indiana, where both Clear Spring and Gainbridge are headquartered and operate, are required under Ind. Code § 27-1-20-21 to file with the Indiana Department of Insurance "on or before March 1 in each year a financial statement for the year ending December 31 immediately preceding" that "shall be verified by the oaths of the president or a vice president and the secretary or an assistant secretary of the company." *See also* Ind. Code § 27-1-20-22 (oath requirement for insurance companies submitting annual reports). This report must comply with Ind. Code § 27-1-3-13, meaning it must be "prepared in accordance with Annual Statement Instructions, and following practices and procedures prescribed by the Accounting Practices and Procedures Manual" of the NAIC.

66. Pursuant to Ind. Code § 27-1-20-33, a foreign-domiciled insurer doing business in Indiana, such as Clear Spring and Gainbridge, which are both domiciled in Delaware but do business and are headquartered in Indiana, can comply with § 27-1-20-21 by making annual and quarterly filings with the NAIC that are "in the same format; and of the same scope" as those required under § 27-1-20-21. Clear Spring and Gainbridge filed their annual reports with the NAIC in this fashion.

67. Walter (as the ultimate control person of Clear Spring and Gainbridge) and the Signatory Officer Defendants were responsible for the filing and accuracy of Clear Spring's and Gainbridge's annual reports during the Class Period, which Ind. Code § 27-1-20-21 required. Indeed, Signatory Officer Defendants Towriss, Wang, Bloom, and Nettleton signed and swore to the accuracy of annual reports of both Clear Spring and Gainbridge filed during the Class Period, attesting that the annual statements "together with related exhibits, schedules and explanations…is a full and true statement of all the assets and liabilities and of the condition and affairs" of the insurers that was "completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual….according to the best of their information, knowledge and belief, respectively."

68. The NAIC Accounting Practices and Procedures Manual imposes specific and stringent requirements for accounting for transactions with and investments in related parties. The NAIC Statement of Statutory Accounting Principles ("SSAP") No. 25 defines and governs accounting for related parties, and requires that transactions with related parties be identified, disclosed, and accounted for according to their economic substance rather than their form. Investments in and advances to related parties are subject to heightened scrutiny, valuation limits, and disclosure precisely because a self-dealing insurer can disguise weakness by transacting with entities it controls.

69. SSAP No. 25 defines "related parties" as "entities that have common interests as a result of ownership, control, affiliation, or by contract," which encompasses not only "affiliates", [2]

---

[2] SSAP No. 25 defines an affiliate as "an entity that is within the holding company system or a party that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the reporting entity" and "includes a parent or subsidiary and may also include partnerships, joint ventures, and limited liability companies," as well as "any person

but also the "principal owners, directors, and officers of the reporting entity," "[c]ompanies and entities which share common control, such as principal owners, directors, or officers, including situations where principal owners, directors, or officers have a controlling stake in another reporting entity," "[a]ny direct or indirect ownership greater than 10% of the reporting entity," "management of the reporting entity, its parent or affiliates (including directors)," and a "party which has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interest."

70. Under this definition, and given Walter/TWG Global's ownership of Clear Spring and Gainbridge, any investment held in a Walter/TWG Global enterprise by Clear Spring or Gainbridge would satisfy SSAP No. 25's definition of a related-party investment. Accordingly, those investments were required to be disclosed in Clear Spring's and Gainbridge's annual statements to the NAIC and state regulators, including the Indiana and Delaware Departments of Insurance, as related-party or "affiliated" investments.

71. An asset's classification determines how much capital an insurer must hold against it and how the insurer presents it to regulators and the public. SSAP No. 26R governs bonds; SSAP No. 43R governs asset-backed and structured securities; and, effective January 1, 2025, a principles-based bond definition distinguishes true "issuer credit obligations" from "asset-backed securities." Classifying a related-party private-credit exposure as a favorably treated non-related-party bond, rather than as a related-party invested asset, understates the insurer's related-party

that is directly or indirectly, owned or controlled by the same person or by the same group of persons, that, directly or indirectly, own or control the reporting entity."

concentration, reduces its apparent asset-risk (C-1) charge under risk-based capital rules, and inflates its apparent surplus and financial strength.

72. In other words, misclassifying related-party or "affiliated" investments as non-related-party or "unaffiliated" investments makes an insurer's general account appear financially stronger and less risky than it is. Rating agencies, in turn, would amplify this effect by assigning higher financial-strength ratings based on the inaccurately classified investments.

73. Both Clear Spring and Gainbridge filed annual statements each year of the Class Period with the NAIC, the Delaware Department of Insurance, and, via Ind. Code § 27-1-20-33, with Indiana. In those statements, Walter, as the controlling person of both insurers, and the Signatory Officer Defendants, as officers of both insurers, attested to the accuracy of disclosures regarding related-party transactions.

74. In those disclosures, Clear Spring and Gainbridge affirmatively represented, and their common officers verified in sworn and notarized regulatory filings, that related-party investments made up only a small share of their respective general accounts.

75. This was inaccurate, because those annual statements did not disclose the true nature or extent of the related-party investments in the general accounts. Clear Spring's and Gainbridge's recent reclassifications and corrections to earlier disclosures, as well as their reported efforts to exchange related-party investments for non-related-party investments, illustrate their failure to accurately disclose the nature and extent of those investments, as detailed below.

76. All of these Indiana insurance law requirements related to filing accurate financial statements and disclosure of related-party investments are incorporated into the annuity contracts sold by Clear Spring and Gainbridge as a matter of law.

77. Each fixed and fixed-indexed annuity that Clear Spring and Gainbridge issued during the Class Period, including each annuity Plaintiff purchased, is a contract of insurance under Indiana Code § 27-1-5-1, issued by insurers licensed by the Indiana Department of Insurance who were required to comply with the requirements of Title 27 of the Indiana Code governing insurers.

78. The Indiana insurance laws in force when each contract was made therefore form part of each contract as implied and mandatory terms, without any statement to that effect being required.

79. Those laws include requirements that: (a) an insurer doing business in Indiana must file an annual statement each year, verified under oath by its officers, with the NAIC and Indiana Department of Insurance (Indiana Code §§ 27-1-20-21, 27-1-20-22, and 27-1-20-33); (b) the annual statement must be prepared in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual, including SSAP No. 25's requirement that related-party investments be identified and disclosed (Indiana Code § 27-1-3-13); and (c) the insurer's transactions with affiliates and related parties must be on fair and reasonable terms, must be recorded in books and records that "clearly and accurately disclose the nature and details of the transactions," and, above specified thresholds, must be noticed to the Commissioner of the Indiana Department of Insurance in advance (Indiana Code § 27-1-23-4).

### C. Why Related-Party Investments Are Less Sound for Annuities

80. The annuity market is competitive and transparent as to price. Premium prices, credited interest rates, guaranteed minimum rates, participation and cap rates, surrender-charge schedules, rider charges, and benefit bases are published, compared across issuers, quoted by independent services, and used by purchasers and their financial professionals to select among competing contracts. Insurers with weaker financial profiles must offer more favorable terms to

attract premiums; insurers perceived as stronger can offer less favorable terms. Buyers are willing to pay a higher premium or price to purchase an annuity from a more financially sound insurer.

81. Related-party investments can affect all of these factors, including the price or premium paid for an annuity. They pose a particular problem for annuities and must be disclosed accurately to annuity purchasers because they are not economically equivalent to independent investments bearing nominally comparable credit ratings.

82. Related-party investments are materially less sound for reasons long recognized by insurance regulators, the National Association of Insurance Commissioners, and rating agencies and reflected in binding quantitative limits in state investment codes:

a. **Correlated risk and loss of diversification**. Diversification reduces the likelihood that an annuity-issuing insurer's general account will fail because all its holdings fail simultaneously. A general account containing a large proportion of related-party investments defeats that purpose. If the controlling owner's related-party enterprises deteriorate, the related-party assets in the general account deteriorate at the same time and for the same reasons as the insurer-owner's capacity and willingness to support or back the insurer's general-account obligations. Default correlation for the insurer's annuities approaches unity precisely when diversification is most needed.

b. **Absence of arm's-length bargaining**. The interest rate, covenants, collateral, maturity, and enforcement terms of a related-party loan or investment do not result from adverse negotiation between parties with opposed interests, as they do for independent investments. When a general account makes a related-party loan or investment, no independent lender tests the borrower's creditworthiness or prices

the risk. The ordinary market discipline that makes a credit rating meaningful is therefore absent at origination. The insurer's general account may consequently receive less than it would have received in an independent open-market transaction of similar quality, while the related-party borrower obtains below-market financing at the expense of the general account and the annuity purchasers who rely on its soundness.

c. **Impaired enforcement**. An insurer that lends money from its general account to a related-party entity will not vigorously pursue default remedies or recovery against that entity because the borrower is controlled by, or shares common interests with, the insurer's common controlling person or entity. The practical value of a promise to pay depends on the creditor's willingness to enforce it, and that willingness is compromised when the creditor and debtor answer to the same owner. Annuity purchasers who rely on the soundness of the general account bear the impact of this impaired enforcement.

d. **Valuation opacity**. Related-party private credit lacks an observable market price. A related party may supply or influence the inputs used to determine carrying value, even though that party's performance determines the return. Losses therefore may be recognized late, if at all.

e. **Illiquidity**. Related-party private credit cannot be sold promptly at a reliable price. That illiquidity is incompatible with the liquidity an insurer requires in assets backing annuity obligations.

f. **Regulatory recognition**. State insurance investment codes impose quantitative limits on related-party investments. Statutory accounting requires that related-party

holdings be separately identified on Schedule D and Schedule BA, that transactions with related parties be summarized on Schedule Y, and that related-party relationships be disclosed in Note 10 to the annual statement. Material related-party transactions require prior notice to, and non-disapproval by, the domiciliary commissioner. These requirements exist because legislatures and regulators have determined that related-party status itself presents a distinct and elevated risk to policyholders. Misclassification of related-party transactions defeats each of those protections simultaneously.

g. **Concentration**. Independent of related-party status, a general account with 45.7%-47.8% of invested assets exposed to the performance of a single enterprise group is concentrated to a degree that no rating or reserve methodology assumes and no annuity purchaser would expect.

h. **Capital treatment**. Risk-based capital and rating-agency capital models assign charges based on reported asset class, affiliation status, and credit designation. Assets misreported as independent third-party credit received more favorable capital treatment than their true character warranted, causing reported surplus and capital adequacy—and the financial-strength ratings derived from them—to overstate the insurers' true capacity to pay.

83. In recognition of the risks affiliate and related-party transactions pose to insurers, both Indiana law (Ind. Code § 27-1-23-4) and Delaware law (18 Del. Code § 5005) reflect a strong public policy favoring careful regulation and monitoring of related-party investments by insurance companies. For example, Indiana and Delaware insurance laws for domestic insurers require the

following for related-party investments, meaning investments in companies within the greater insurance holding company system that own or are owned by the domestic insurer:

- "The terms shall be fair and reasonable." (Ind. Code § 27-1-23-4(a)(1); *see also* 18 Del. Code § 5005(a)(1)(a));

- "The books, accounts, and records of each party as to all [related-party] transactions … shall be so maintained as to clearly and accurately disclose the nature and details of the transactions, including accounting information necessary to support the reasonableness of the charges or fees to the respective parties." (Ind. Code § 27-1-23-4(a)(5); *see also* 18 Del. Code § 5005(a)(1)(e));

- Any related-party transactions exceeding 3% of the insurer's admitted assets may not be entered into without advance notice to the respective state insurance Commissioner for review and the opportunity to review and disapprove of the transaction. (Ind. Code § 27-1-23-4(b); *see also* 18 Del. Code § 5005(a)(2));

- "Direct or indirect acquisitions or investments…[i]n (i) a person that controls the insurer; or (ii) an affiliate of the insurer in an amount that, together with the insurer's present holdings in the investments, exceeds two and one-half percent (2.5%) of the insurer's surplus to policyholders." (Ind. Code § 27-1-23-4(b)(6)(a)); and

- Prohibiting insurers from entering "into transactions that are part of a plan or series of like transactions with persons within the insurance holding company system if the purpose of those separate transactions is to avoid the statutory threshold amount and the review that would occur otherwise." (Ind. Code § 27-1-23-4(c); *see also* 18 Del. Code § 5005(a)(3)).

84. Concealing the nature, extent, and amount of related-party transactions—as Clear Spring and Gainbridge have done—violates the public policies motivating these Indiana and Delaware laws, if not the laws themselves, and exposes annuitants to additional, undisclosed risk.

85. The NAIC Insurance Holding Company System framework, like that of Indiana Code chapter 27-1-23 and 18 Del. Code §§ 5001-5016 generally, separately requires transactions between an insurer and its related parties to be fair and reasonable, at arm's length, and disclosed to regulators. It also requires material related-party transactions to be reported annually, all of which is necessary to account for and disclose the risks inherent in such transactions to consumers, rating agencies, and regulators.

86. Furthermore, Clear Spring and Gainbridge were on notice that misrepresenting an insurer's financial condition in connection with the sale of annuities—including through affiliated transactions—injures annuity purchasers. In *Whitmore v. Guggenheim Partners, LLC*, No. 1:14-cv-00948 (N.D. Ill.) (ECF 1) (filed Feb. 11, 2014), a putative class of annuity purchasers alleged that insurers owned or controlled by Guggenheim Partners—including Guggenheim Life and Annuity Company, the predecessor entity to Clear Spring and similarly controlled by Walter—had used affiliated reinsurance and statutory-accounting machinations to misrepresent surplus and sell overpriced annuities. That action settled two days after filing. The overlap in actors, methods, and victims is not coincidental.

## II. The Scheme

### A. Clear Spring and Gainbridge Advertise the Financial Strength and Importance of Their General Accounts to the Public

87. During the Class Period, Clear Spring and Gainbridge repeatedly advertised their annuities as backed by or guaranteed by their respective general accounts and actively promoted the financial strength of those accounts. These representations were substantially based on, and bolstered by, the representations Clear Spring and Gainbridge made in sworn, filed, and mandatory annual statements with the NAIC, Indiana and Delaware Departments of Insurance, and other state insurance regulators.

88. For instance, a 2023 brochure for the Clear Spring ClearFlex Fixed Indexed Annuity (policy form ICC21-I-FLEX-BASE) stated that its "Guarantees are subject to the financial strength and claims-paying ability of the issuing insurance company and are subject to product terms, exclusions, and limitations. Annuities are issued by Clear Spring Life and Annuity Company, 10555 Group 1001 Way, Zionsville, Indiana."

89. A 2024 brochure for the Clear Spring Preserve Multi-Year Guaranteed Annuity (policy form GLA-MYGA-01(2011) or variations of such) advertises "No Risk to Your Principal" and states that "Premium payments, less any surrender charges, premium taxes, and applicable market value adjustment, are guaranteed by Clear Spring Life and Annuity Company." The same brochure notes that "[a]n important feature of annuity contracts is the ability to have income that you cannot outlive. Clear Spring Life can provide you with a guaranteed income stream with the purchase of your tax-deferred annuity, through the ability to annuitize, which turns the deferred account into a scheduled stream of income payments" and also states that "Guarantees are based on the claims-paying ability of Clear Spring Life." This is the precise type of annuity that Plaintiff purchased from Clear Spring on January 8, 2024. The primary source of information regarding the "claims-paying ability of Clear Spring Life" is its sworn, mandatory annual statements filed with the NAIC and state insurance regulators—which were, as detailed below, materially false.

90. Gainbridge's website (https://gainbridge.com/save (last accessed Sept. 25, 2026)), under a heading "Why people trust Gainbridge," advertises that "Gainbridge Life Insurance Company holds an A- (Excellent) rating from AM Best, the 4th highest out of 16. Your money is backed by financial strength you can verify." On information and belief, AM Best's A- rating for Gainbridge was primarily based on disclosures in Gainbridge's sworn, mandatory annual statements.

91. The same webpage, under the heading "Your money is protected," states that "When you put money in with Gainbridge, you want to know it's safe. Here's what backs every guarantee we make." Gainbridge then touts its "Conservative investments" and asserts "We don't take chances with your money. Our portfolio spans public and private markets, built on investment grade bonds, government securities, and other income assets selected through fundamental credit

analysis. Every investment is carefully matched to the policies we write, so your savings stay steady through ups and downs."

92. On August 10, 2026, Gainbridge published on its website an article by Amanda Gile, a "licensed insurance agent and digital support associate at Gainbridge," entitled "Is Gainbridge Safe? What to Know About Gainbridge Annuities" (https://gainbridge.com/post/is-gainbridge-safe (last accessed September 25, 2026)). In that article, Gainbridge stated that:

- "When considering a Gainbridge annuity, consumers commonly want to understand the company behind the product, the regulatory framework that applies to life insurers, and the features and limitations of a fixed annuity contract."

- "Gainbridge is a state-regulated insurance marketing platform, not a bank or an investment fund. The annuity products offered through Gainbridge are issued by Gainbridge Life Insurance Company."

- "Group 1001 and its subsidiaries, including Gainbridge, must comply with the insurance laws and regulations of each state in which they are licensed, as administered by state insurance departments and consistent with model laws and standards promulgated by the National Association of Insurance Commissioners (NAIC)."

- "Life insurance companies are subject to state solvency requirements, including risk-based capital rules, statutory reserving requirements, and periodic financial examinations. These requirements are designed to help ensure insurers can meet their contractual obligations, but they do not eliminate insurer credit risk."

- "An annuity's contractual guarantees are supported by the general account of the issuing insurance company and are subject to the insurer's claims-paying ability. Insurers can and have failed; consumers considering an annuity should review the issuer's financial-strength ratings from independent agencies and consult a qualified financial professional."

- "Unlike traditional investments that rely on market performance, the guarantees under a fixed annuity contract are contractual obligations of the issuing life insurance company, supported by the insurer's general account and subject to the insurer's claims-paying ability."

- "Consumers considering an annuity should evaluate multiple factors, including the issuer's financial-strength ratings, the specific contract terms (surrender charge schedule, MVA, and payout options), and their own timeline, age, tax situation, and liquidity needs."

- "When you're evaluating the safety of an annuity company, the fundamentals matter. Gainbridge checks all the boxes — financial strength, strong customer reviews, and a business model built on transparency. Consumers evaluating an annuity issuer may consider financial-strength ratings, customer reviews, and the transparency of product disclosures, alongside other factors."

- "The Gainbridge Save℠ Annuity is an insurance contract issued by a life insurance company. Annuity contract obligations are supported by the general account and the claims-paying ability of the issuing insurance company."

- "You can have confidence in Gainbridge for several reasons: The Gainbridge Save Annuity is supported by the claims-paying ability of Gainbridge Life Insurance Company, which holds an A- (Excellent) rating by AM Best…. It is subject to state solvency, reserving, and consumer-protection laws administered by state insurance departments, consistent with model laws and standards promulgated by the NAIC…. [and] Gainbridge Save credits interest at a specified rate under the contract terms, subject to the claims-paying ability of the issuing insurance company."

- "All guarantees, including any reference to principal protection or guaranteed interest, are subject to the financial strength and claims-paying ability of the issuing insurance company."

93. The "insurance laws and regulations of each state in which they are licensed, as administered by state insurance departments and consistent with model laws and standards promulgated by the National Association of Insurance Commissioners (NAIC)," with which Gainbridge had to comply included Indiana Code §§ 27-1-20-21 and 27-1-20-33 (requiring that insurers operating in Indiana file annual statements with the NAIC and the Indiana Department of Insurance), Indiana Code § 27-1-3-13 (requiring that insurers prepare the annual statement consistent with NAIC accounting standards), and Indiana Code § 27-1-20-22 (requiring certain officers of the insurer to verify the accuracy of annual statements under oath).

94. Brochures and website articles like these make clear that Clear Spring's and Gainbridge's general accounts were primary selling points for the guarantees provided under their fixed and fixed-indexed annuities. The primary sources of information regarding the financial strength and status of those general accounts were the state-mandated, sworn annual statements.

95. When Plaintiff and the Class bought annuities from Clear Spring and Gainbridge whose promises to pay were backed by their respective general accounts, they agreed to those premiums and accepted those interest rates based on the credit quality, financial strength, and ability to pay of Clear Spring and Gainbridge as disclosed in their annual statements. What they received instead was a less valuable, inferior product, because both Clear Spring and Gainbridge had misrepresented the true nature and risk of the related-party investments in their respective general accounts.

### B. Clear Spring's Annual Statements Were Inaccurate Regarding Related-Party Investments

96. Before June 2026, Clear Spring's annual statements reported that only a relatively small proportion of its general account consisted of related-party investments.

97. For instance, Clear Spring's Annual Statement for the Year Ended December 31, 2025, was subscribed and sworn by the Signatory Officer Defendants on February 18, 2026. In Note 10 of the year-end 2025 Annual Statement—which Clear Spring filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators—Clear Spring reported its "affiliated investments" (a subset of related-party investments under SSAP No. 25) and "investments in related-party entities" for both December 31, 2024, and December 31, 2025:

At December 31, 2025 and 2024, the Company held affiliated investments, excluding investments in subsidiaries, as follows:

| | 12/31/2025 | 12/31/2024 |
|---|---|---|
| Bonds | $ 3,709,000 | $ 309,832,157 |
| Mortgage Loans on Real Estate | 23,600,000 | 23,595,447 |
| Preferred Stocks | 77,767,123 | 74,000,000 |
| Other Invested Assets | $ 10,000,000 | $ 10,000,650 |
| Short Term Investments | 76,000,000 | 277,000,000 |
| Total Affiliated Investments | $ 191,076,123 | $ 694,428,254 |

Investments in related party entities at December 31, 2025 and 2024 consist of:

| | 12/31/2025 | 12/31/2024 |
|---|---|---|
| Bonds | $ 88,069,218 | $ 92,537,644 |
| Preferred Stocks | — | 3,767,123 |
| Other Invested Assets | 139,792,078 | 144,758,637 |
| Short Term Investments | 67,536,662 | 160,939,742 |
| Total Related Party Investments | $ 295,397,958 | $ 402,003,146 |

98. Other than these affiliated investments and investments in related-party entities, Clear Spring's 2025 Annual Statement did not report any other related-party investments.

99. Combining "affiliated investments" and "investments in related-party entities" to determine total related-party investments under SSAP No. 25, Clear Spring claimed to have **$1,096,431,400 in related-party investments at the end of 2024** (representing approximately 8.81% of Clear Spring's $12.4 billion in general-account assets at the end of 2024) and **$486,474,081 in related-party investments at the end of 2025** (representing approximately 3.99% of Clear Spring's $12.2 billion in general-account assets at the end of 2025).

100. These numbers, however, were materially inaccurate and substantially understated, as Clear Spring's own June 26, 2026 Independent Auditors' Report and its Quarterly Statement as of June 30, 2026 revealed.

101. In its Quarterly Statement as of June 30, 2026—subscribed to and sworn to by Signatory Officer Defendants and submitted to the NAIC and state insurance regulators on August 5, 2026—Clear Spring disclosed that it and Delaware Life had received subpoenas from the U.S.

Attorney's Office for the Southern District of New York in February 2026. Clear Spring also disclosed that the SEC was conducting a parallel investigation, that Clear Spring had initiated an internal investigation identifying errors "relating to the identification and presentation of certain related-party investments" in Clear Spring's 2025 Annual Statement, and that it was therefore restating prior years' related-party investment figures.

102. According to a Delaware Life website press release (available at https://www.delawarelife.com/content/affiliated-investments-reduction-plan-update, last visited Sept. 29, 2026), the subpoenas to Delaware Life and Clear Spring were served "in early February 2026"—near or even before the Signatory Officer Defendants subscribed to, swore to the accuracy of, and filed the year-end 2025 Annual Statement with the NAIC and state insurance regulators on February 18, 2026.

103. The subpoenas reportedly followed an internal whistleblower complaint about how transactions involving the insurance units were booked and presented, as well as the execution of at least one search warrant on Mark Walter's private jet at Midway International Airport in Chicago in 2025. During that search, federal agents seized Mr. Walter's phone and laptop and devices belonging to his employees.

104. These "errors" were massive. According to the restated year-end 2024 numbers in Clear Spring's June 26, 2026 Independent Auditors' Report, Clear Spring increased its general-account related-party investments as of December 31, 2024, from **$1,096,431,400**, as reported in its original 2024 Annual Statement, to **$5,941,931,000**—a more than fivefold increase. Related-party investments did not represent 8.81% of Clear Spring's $12.4 billion in general-account assets at the end of 2024, as Clear Spring originally reported in its 2024 Annual Statement; they represented **47.8%—or nearly half—of the general-account assets**.

105. In other words, Clear Spring's related-party assets at year-end 2024 ($5,941,931,000) ***were more than five times the amount of*** Clear Spring's reported capital surplus ($1,192,388,759) at the end of 2024. On information and belief, Clear Spring obtained no permission from Indiana, Delaware, or any other state insurance regulator to hold related-party investments that so greatly exceeded its capital surplus.

106. And according to both Clear Spring's June 30, 2026 Quarterly Statement and June 26, 2026 Independent Auditors' Report, Clear Spring restated and increased its general-account related-party investments as of December 31, 2025, from **$486,474,081** to at least **$5,551,138,095**—a roughly elevenfold increase.[3] Related-party investments were not 3.99% of Clear Spring's $12.2 billion in general-account assets at the end of 2025, as originally reported in Clear Spring's 2025 Annual Statement; instead, they represented as much as **45.5% of the assets in the general account**.

107. Clear Spring's year-end 2025 related-party investments ($5,551,138,095) ***were approximately five times*** the amount of Clear Spring's capital surplus ($1,191,040,376) at the end of 2025—a position that, on information and belief, Clear Spring had obtained no regulatory approval from any state insurance regulator to hold.

108. Nearly all of these discrepancies can be explained by what the Independent Auditors' Report called "Investments that are Predominantly Contingent on the Performance of Affiliates." The report stated that "[r]elated-party investments are identified pursuant to SSAP No. 25," under which investments are considered "to be related-party investments where the

---

[3] Elsewhere in the same Q2 2026 Statement (General Interrogatory 13.2), Clear Spring identifies an adjusted December 31, 2025 Carrying Value for general account "investments in parent, subsidiaries and affiliates" of $5,894,580,687.

investment return is predominantly contingent on the performance of related parties," with "predominantly contingent" defined as "greater than 50%."

109. These investments always fell within the SSAP No. 25 definition of related-party investments summarized in paragraph 70 above. SSAP No. 25 did not change during the Class Period in a way that could have reclassified these investments from non-related-party to related-party investments. Indeed, the last amendment to SSAP No. 25 occurred on August 13, 2024, and did not alter the related-party investment definition.

110. Yet this category of "Investments that are Predominantly Contingent on the Performance of Affiliates" did not appear in Clear Spring's original 2025 Annual Statement as filed on February 18, 2026. As shown in the table below from the June 26, 2026 Independent Auditors' Report, and as compared with the original 2025 Annual Statement, Clear Spring had **failed to report billions of dollars of related-party investments in its general account before June 26, 2026**:

The Company has private credit investments with certain counterparties in which the investment return is predominantly contingent on the performance of affiliates. As of June 30, 2026 and December 31, 2025, the carrying value of these investments was as follows:

| | Carrying Value | |
|---|---|---|
| | June 30, 2026 | December 31, 2025 (Restated) |
| Bonds | $ 3,061,714,135 | $ 3,011,155,705 |
| Other Invested Assets | 261,516,159 | 376,863,263 |
| Short-term Investments | 520,553,080 | 1,220,459,742 |
| Total | $ 3,843,783,374 | $ 4,608,478,710 |

Additionally, the Company holds investments made to certain counterparties in which the proceeds from such investments were used to purchase separate account funding agreements ("SAFAs"). Repayment of these investments is based on assets supporting the SAFAs, which are predominantly contingent on the performance of affiliates. As of June 30, 2026 and December 31, 2025, the carrying value of these investments was $289,576,000 and $289,576,000 (restated), respectively.

Additionally, the Company holds investments in trust notes in which the proceeds from such investments were used to purchase general account funding agreements and a pool of private-credit assets, which are predominantly contingent on the performance of affiliates. As of June 30, 2026 and December 31, 2025, the carrying value of these investments was $315,570,000 and $500,486,235 (restated), respectively.

111. Clear Spring's Independent Auditors' Report offers no explanation of why this "error" occurred or how Clear Spring could have overlooked billions of dollars in related-party investments in its own general account.

112. Clear Spring's omissions and misrepresentations are even starker and more difficult to explain when comparing the types of related-party investments reported in the original 2025 Annual Statement with the corrected amounts in the Independent Auditors' Report. Clear Spring's reports broadly categorize its related-party investments as "Short-Term Investments," "Bonds," "Other Invested Assets," "Preferred Stocks," and, in the Independent Auditors' Report only, "Mortgage Loans." The reports do not provide a rational or legitimate explanation for why Clear Spring omitted billions of dollars in related-party investments in short-term investments, bonds, and other invested assets before June 26, 2026.

| **Related Party Investment Type** | **12/31/2024 (2025 Annual Statement filed Feb. 18, 2026)** [4] | **12/31/2024 (Independent Auditors' Report)** [5] | **% Increase** | **12/31/2025 (2025 Annual Statement filed Feb. 18, 2026)** [6] | **12/31/2025 (Independent Auditors' Report)** [7] | **% Increase** |
|---|---|---|---|---|---|---|
| **Short-Term Investments** | $437,939,742 | **$1,404,710,000** | **220.8%** | $143,536,662 | **$1,255,459,742** | **774.7%** |
| **Bonds** | $402,369,801 | **$3,136,225,000** | **679.4%** | $91,778,218 | **$3,014,864,705** | **3,184.9%** |
| **Other Invested Assets** | $154,759,287 | **$456,873,000** | **195.2%** | $149,792,078 | **$389,384,290** | **159.9%** |
| Preferred Stocks | $77,767,123 | $77,767,000 | 0% | $77,767,123 | $77,767,123 | 0% |
| Mortgage Loans | $23,595,447 | $23,595,000 | 0% | $23,600,000 | $23,600,000 | 0% |
| **TOTAL** | **$1,096,431,400** | **$5,099,170,000** | **365.1%** | **$486,474,081** | **$4,761,075,860** | **878.7%** |

[4] Calculated by adding "affiliated investments, excluding investments in subsidiaries and nonadmitted investments" and "investments in related-party entities" for each category.

[5] Calculated by adding "Direct Investments in Affiliates and Other Related Parties" and "Investments that are Predominantly Contingent on the Performance of Affiliates" for each category.

[6] See supra n. 4.

[7] See supra n. 5.

113. To date, Clear Spring has not reclassified or corrected any of its annual statements before 2024. However, Plaintiff's counsel's investigation, as detailed further below, has confirmed that Clear Spring annual statements dating back to at least 2017 have contained similarly false representations regarding related-party investments in its general accounts.

**C. Gainbridge's Annual Statements Were Inaccurate Regarding Related-Party Investments**

114. Like Clear Spring, Gainbridge's original, sworn year-end 2024 and year-end 2025 Annual Statements reported minimal related-party investments in Gainbridge's general accounts.

115. For instance, Note 10 of Gainbridge's original Annual Statement for the year ended December 31, 2024—which the Signatory Officer Defendants swore to and subscribed on February 14, 2025, and filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators—reported no investments in affiliated entities and a carrying value for investments in related-party investments of just **$11.23 million at the end of 2024**, representing just 2.4% of Gainbridge's $472.6 million in general-account assets as of year-end 2024:

The Company did not have any investments in affiliated entities at December 31, 2024. Investments in related party entities at December 31, 2024 consist of:

| | Carry Value | Fair Value |
|---|---|---|
| Bonds | $ 2,642,983 | $ 2,627,850 |
| Other Invested Assets | 8,586,901 | 8,471,111 |
| Total Related Party Investments | 11,229,884 | 11,098,961 |

116. Note 10 of Gainbridge's original Annual Statement for the year ended December 31, 2025—subscribed and sworn to by the Signatory Officer Defendants on February 18, 2026, and filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators—similarly reported a minimal amount of affiliated and related-party

investments totaling roughly **$28.56 million at the end of 2025**, representing just 1.67% of Gainbridge's $1.7 billion in general-account assets as of year-end 2025:

At December 31, 2025 and 2024, the Company held affiliated investments as follows:

| | 12/31/2025 | 12/31/2024 |
|---|---|---|
| Other Invested Assets | $ 10,430,150 | $ — |
| Total Affiliated Investments | $ 10,430,150 | $ — |

Investments in related party entities at December 31, 2025 and 2024 consist of:

| | 12/31/2025 | 12/31/2024 |
|---|---|---|
| Bonds | $ 9,684,744 | $ 2,642,983 |
| Other Invested Assets | 8,447,445 | 8,586,901 |
| Total Related Party Investments | $ 18,132,189 | $ 11,229,884 |

117. The disclosures of related-party investments in Gainbridge's original, sworn year-end 2024 and year-end 2025 Annual Statements were materially inaccurate.

118. In its June 26, 2026 Independent Auditors' Report, Gainbridge disclosed that, in February 2026, its affiliates Clear Spring and Delaware Life had been served with grand jury subpoenas from the U.S. Attorney's Office for the Southern District of New York, and that the SEC was conducting a parallel investigation. Gainbridge also stated that pursuant to an internal investigation launched after receiving the subpoenas, it had identified errors "relating to the identification and presentation of certain related-party investments" and was "restat[ing] certain prior year disclosures to reflect additional related-party investments that were omitted" from prior Annual Statements.

119. Again, these "errors" drastically understated Gainbridge's related-party investment exposure. According to the restated numbers for year-end 2024 in Gainbridge's June 26, 2026 Independent Auditor's Report, Gainbridge increased its general-account related-party investments as of December 31, 2024, from **$11.23 million** in its original 2024 Annual Statement to

**$45,337,000**—a greater-than-fourfold increase. Related-party investments were not 2.4% of Gainbridge's $472.6 million in general-account assets at the end of 2024 as originally reported, but rather represented approximately **9.6% of the general-account assets**.

120. The $45,337,000 in restated year-end 2024 related-party investments held by Gainbridge represented **approximately 75.5% of Gainbridge's reported capital surplus** ($60,039,581) at the end of 2024. On information and belief, Gainbridge, like Clear Spring, had received no permission from any state insurance regulator to hold related-party investments that were so large relative to its capital surplus.

121. The June 26, 2026 Independent Auditor's Report also restated Gainbridge's general-account related-party investments as of December 31, 2025, from **$28,562,339,** as originally reported in the 2025 Annual Statement, to approximately **$268,714,000**—an over-tenfold increase. Related-party investments were not 1.67% of Gainbridge's $1.7 billion in general-account assets as of year-end 2025 but instead represented **over 15.7%** of the roughly $1.7 billion in Gainbridge's general-account assets.

122. The $268,714,000 in restated related-party investments as of year-end 2025 represented **approximately 85.6%** of Gainbridge's $314 million in capital surplus at the end of 2025—a position that, on information and belief, Gainbridge had obtained no regulatory approval from any state insurance regulator to hold.

123. To date, Gainbridge has not reclassified or corrected any of its annual statements before 2024. However, Plaintiff's counsel's investigation, as detailed further below, has confirmed that Gainbridge annual statements dating back to at least 2022 have contained similarly false representations regarding related-party investments in its general accounts.

### D. Purchasers Bought Annuities from Clear Spring and Gainbridge Based on Inaccurate Disclosures and Annual Statements

124. During the Class Period, Clear Spring sold billions of dollars of annuities to members of the proposed Class. Clear Spring sold these annuities based on promises (contained in brochures, website advertising and articles, and the annuity contracts themselves) that touted Clear Spring's financial strength and credit rating, and its ability to satisfy the contractual promises contained in the annuity contracts.

125. Those claims of financial strength and independent credit ratings, however, were a sham. Every one of Clear Spring's advertised and contracted promises of financial strength was tainted, because each rested on mandatory, sworn state insurance filings that directly misrepresented the extent of related-party investments in Clear Spring's general account.

126. Between 2022 and 2025, Clear Spring reported hundreds of millions of dollars in direct annuity premiums for fixed and fixed-indexed annuities annually:

| Year | Fixed Annuity Premiums | Fixed Indexed Annuity Premiums | Combined Total |
|---|---|---|---|
| **2025** | $774,495,554 | $162,175,284 | $937,223,180 |
| **2024** | $619,794,783 | $136,592,783 | $756,557,314 |
| **2023** | $596,472,853 | $141,990,857 | $738,463,710 |
| **2022** | $641,261,117 | $415,048,117 | $1,056,309,234 |

Source: Clear Spring Annual Statements, "Analysis of Operations by Lines of Business – Individual Annuities"

127. During the Class Period, Clear Spring offered at least the following annuity products for sale:

| **Product** | **Subtype** |
|---|---|
| ClearFlex | Fixed-indexed annuity |
| ViStar | Fixed-indexed annuity |

| Product | Subtype |
|---|---|
| Highlander 7 | Fixed-indexed annuity |
| Highlander | Fixed-indexed annuity |
| Preserve MYGA | Multi-year guaranteed fixed annuity |
| ProOption MYGA | Multi-year guaranteed fixed annuity |

128. Plaintiff in this case bought the Preserve Multi-Year Guaranteed Annuity (with a Guaranteed Interest Rate Period of five years during which the Guaranteed Interest Rate was 5.90% per year, and a Minimum Guaranteed Interest Rate following that period of 1.00%) issued by Clear Spring for an initial premium amount of $11,059.61 on January 8, 2024.

129. In Plaintiff's Preserve Multi-Year Guaranteed Annuity, Clear Spring also contracted to: pay monthly income at the annuity date pursuant to the terms of the Table of Monthly Annuity Payments listed below; guarantee a Minimum Guaranteed Contract Value (equal to "87.5% of the premium, less any withdrawals, accumulated at the Nonforfeiture Interest Rate" of 3.00%); provide a death benefit to Plaintiff's named beneficiary should Plaintiff die prior to the maturity date of the annuity; and an option to apply any or all of the account value at the end of the contracted five-year "Guaranteed Interest Rate Period to a Ten-Year Certain Immediate Annuity or any other Settlement Option then offered by the Company, without Surrender Charges or a Market Value Adjustment being applied."

## TABLE OF MONTHLY ANNUITY PAYMENTS

The amounts of monthly annuity payments in the table below are shown for each $1,000 of Account Value available on the Maturity Date. Age, as used in the table, means the number of years and months from the date of birth of the Annuitant or beneficiary at the time when the payment option is elected. Interpolated values will apply to amounts for ages involving months and years between the age in years shown in the table.

**OPTIONS ONE AND TWO**
**MONTHLY INCOME RATES PER $1,000 OF PROCEEDS**

| | Male | | Female | | | Male | | Female | |
|---|---|---|---|---|---|---|---|---|---|
| Age | Life | 10 Year Certain & Life | Life | 10 Year Certain & Life | Age | Life | 10 Year Certain & Life | Life | 10 Year Certain & Life |
| 45 | 2.68 | 2.67 | 2.48 | 2.48 | 71 | 5.78 | 5.36 | 5.13 | 4.92 |
| 46 | 2.73 | 2.72 | 2.53 | 2.53 | 72 | 6.02 | 5.54 | 5.35 | 5.09 |
| 47 | 2.79 | 2.78 | 2.58 | 2.57 | 73 | 6.29 | 5.71 | 5.59 | 5.28 |
| 48 | 2.85 | 2.84 | 2.63 | 2.63 | 74 | 6.57 | 5.89 | 5.84 | 5.47 |
| 49 | 2.92 | 2.90 | 2.69 | 2.67 | 75 | 6.87 | 6.08 | 6.12 | 5.66 |
| 50 | 2.98 | 2.97 | 2.75 | 2.74 | 76 | 7.19 | 6.26 | 6.42 | 5.86 |
| 51 | 3.06 | 3.03 | 2.81 | 2.80 | 77 | 7.53 | 6.45 | 6.74 | 6.07 |
| 52 | 3.13 | 3.10 | 2.87 | 2.86 | 78 | 7.90 | 6.63 | 7.09 | 6.28 |
| 53 | 3.21 | 3.18 | 2.94 | 2.92 | 79 | 8.30 | 6.81 | 7.47 | 6.49 |
| 54 | 3.29 | 3.26 | 3.01 | 2.99 | 80 | 8.72 | 6.99 | 7.88 | 6.70 |
| 55 | 3.37 | 3.34 | 3.08 | 3.06 | 81 | 9.17 | 7.16 | 8.32 | 6.90 |
| 56 | 3.46 | 3.43 | 3.16 | 3.14 | 82 | 9.65 | 7.33 | 8.80 | 7.10 |
| 57 | 3.56 | 3.52 | 3.24 | 3.22 | 83 | 10.17 | 7.48 | 9.32 | 7.29 |
| 58 | 3.66 | 3.61 | 3.33 | 3.30 | 84 | 10.72 | 7.63 | 9.89 | 7.46 |
| 59 | 3.77 | 3.71 | 3.42 | 3.39 | 85 | 11.30 | 7.77 | 10.50 | 7.63 |
| 60 | 3.89 | 3.82 | 3.52 | 3.49 | 86 | 11.93 | 7.90 | 11.15 | 7.78 |
| 61 | 4.01 | 3.93 | 3.62 | 3.58 | 87 | 12.59 | 8.02 | 11.85 | 7.92 |
| 62 | 4.14 | 4.05 | 3.73 | 3.69 | 88 | 13.30 | 8.13 | 12.60 | 8.05 |
| 63 | 4.28 | 4.17 | 3.85 | 3.80 | 89 | 14.05 | 8.23 | 13.40 | 8.16 |
| 64 | 4.43 | 4.30 | 3.98 | 3.91 | 90 | 14.85 | 8.32 | 14.23 | 8.26 |
| 65 | 4.58 | 4.43 | 4.11 | 4.03 | 91 | 15.69 | 8.40 | 15.11 | 8.35 |
| 66 | 4.75 | 4.57 | 4.25 | 4.16 | 92 | 16.59 | 8.47 | 16.02 | 8.42 |
| 67 | 4.93 | 4.72 | 4.40 | 4.30 | 93 | 17.54 | 8.53 | 16.97 | 8.49 |
| 68 | 5.12 | 4.87 | 4.57 | 4.44 | 94 | 18.55 | 8.58 | 17.96 | 8.55 |
| 69 | 5.33 | 5.03 | 4.74 | 4.59 | 95 | 19.64 | 8.63 | 19.00 | 8.60 |
| 70 | 5.54 | 5.20 | 4.93 | 4.75 | | | | | |

130. Clear Spring's contractual promises—including specifically the initial five-year Guaranteed Interest Rate, the Minimum Guaranteed Interest Rate, the Monthly Annuity Payments

(once annuitized), and the death benefit—were all guaranteed and backed by the general account of Clear Spring, and thus the financial soundness of the general account was material to the terms of the Preserve Multi-Year Guaranteed Annuity that Plaintiff purchased.

131. Likewise, prior to Plaintiff purchasing his Preserve Multi-Year Guaranteed Annuity on January 8, 2024, Clear Spring made representations—on its websites, in brochures, and in its annuity contract with Plaintiff—regarding Clear Spring's financial strength, credit rating, and ability to back the promises it was contracting for that were inaccurate. Specifically, those representations were inaccurate because they were based on false information that Clear Spring had filed, and its officers had sworn to, in mandatory state insurance filings regarding the extent of related-party investments in Clear Spring's general account.

132. The credit ratings themselves that Clear Spring touted were only achieved because credit rating agencies assessed Clear Spring's credit based on false representations contained in its annual statements, including inaccurate statements regarding its general account's exposure to related-party investments. Plaintiff and the Class bought policies and paid premiums for a highly creditworthy insurer, but did not receive that with their annuity—instead, they received an inferior annuity with an insurer that was far riskier, all because of Clear Spring's misrepresentations in its annual statements.

133. Due to the surrender/withdrawal charges and market value adjustments that Plaintiff would be subjected to if he were to surrender his annuity or withdraw his account, Plaintiff cannot rescind his Clear Spring contract without losing a considerable amount of his premium and/or accumulated interest.

134. The premiums Clear Spring collected from Plaintiff and the members of the Proposed Class allowed Clear Spring to accumulate substantial assets within its general account. As of June 30, 2026, Clear Spring reported $15.2 billion in assets under management.

135. Similarly, Gainbridge sold hundreds of millions of dollars in annuities during the Class Period to members of the proposed Class based on brochures, advertisements, website posts, and contractual promises in the annuity contract itself touting Gainbridge's financial strength, credit rating, and ability to pay the annuity's contractual obligations. These representations were false—all of them were based on Gainbridge's sworn, mandatory state insurance filings, in which Gainbridge misrepresented the share of related-party investments in its general account.

136. Between 2023 and 2025, Gainbridge reported hundreds of millions of dollars in direct annuity premiums for fixed and fixed-indexed annuities:

| Year | Fixed Annuity Premiums | Fixed Indexed Annuity Premiums | Combined Total |
|---|---|---|---|
| **2025** | $945,104,697 | $4,338,759 | $949,443,456 |
| **2024** | $284,061,502 | $0 | $284,061,502 |
| **2023** | $9,092,643 | $0 | $9,092,643 |

*NOTE: Only 2025 annual statement data includes fixed/indexed breakdown. 2024 and 2023 figures are total individual annuity premiums from the Five-Year Historical Data section.*

137. During the Class Period, Gainbridge offered at least all of the following annuity products for sale:

| **Product** | **Subtype** |
|---|---|
| OneUp Fixed Index Annuity | Fixed-indexed Annuity |
| Save Annuity | Multi-year guaranteed fixed annuity |

| Product | Subtype |
|---|---|
| SteadyPace Single Premium Individual Deferred Annuity | Multi-year guaranteed fixed annuity |

138. Plaintiff bought three separate SteadyPace Single Premium Individual Deferred Annuities from Gainbridge: (1) a policy with a 3-year Guaranteed Interest Rate Period and a Guaranteed Interest Rate of 5.55% for an initial premium of $5,220; (2) a policy with a 3-year Guaranteed Interest Rate Period and a Guaranteed Interest Rate of 5.55% for an initial premium of $7,540.92; and (3) a policy with a 5-year Guaranteed Interest Rate Period and a Guaranteed Interest Rate of 6.15% for a premium of $100,000.

139. In Plaintiff's SteadyPace Single Premium Individual Deferred Annuities, Gainbridge also contracted to:

- Pay a Minimum Guaranteed Interest Rate of 1.00% for any subsequent period after the initial Guaranteed Interest Rate Period;
- Provide options after the first contract year to annuitize the contract as: (1) a Single Life Annuity; (2) a Single Life Annuity with Guaranteed Annuity Payment Period Between 5 and 20 Years; (3) a Joint and Survivor Annuity; (4) a Guaranteed Annuity Payment Period Between 10 and 20 Years; or (5) other options offered by Gainbridge at the time of annuitization, with a promise of minimum monthly income at the annuitization date under option (2) with 5- or 10-year guaranteed annuity payment periods pursuant to the terms of the Table of Monthly Annuity Payments listed below;
- Guarantee a Minimum Guaranteed Contract Value ("equal to the Premium multiplied by the Nonforfeiture Premium Percentage" of 87.5%, "less any withdrawals (not including any Withdrawal Charges or Market Value Adjustments), plus interest at the Nonforfeiture Interest Rate" of 3.00%); and
- Provide a death benefit to Plaintiff's named beneficiary should Plaintiff die prior to the maturity date of the annuity.

**SINGLE LIFE ANNUITY WITH GUARANTEED ANNUITY PAYMENT PERIOD OF 5 YEARS AND SINGLE LIFE ANNUITY WITH GUARANTEED ANNUITY PAYMENT PERIOD OF 10 YEARS MINIMUM MONTHLY PAYMENT RATES PER $1,000 OF PROCEEDS**

| | Male | | Female | | | Male | | Female | |
|---|---|---|---|---|---|---|---|---|---|
| Age | 5-Year Certain & Life | 10-Year Certain & Life | 5-Year Certain & Life | 10-Year Certain & Life | Age | 5-Year Certain & Life | 10-Year Certain & Life | 5-Year Certain & Life | 10-Year Certain & Life |
| 45 | 2.34 | 2.34 | 2.18 | 2.18 | 74 | 5.43 | 5.16 | 4.85 | 4.70 |
| 46 | 2.39 | 2.38 | 2.22 | 2.22 | 75 | 5.66 | 5.33 | 5.05 | 4.88 |
| 47 | 2.44 | 2.43 | 2.26 | 2.26 | 76 | 5.90 | 5.51 | 5.28 | 5.07 |
| 48 | 2.49 | 2.48 | 2.30 | 2.30 | 77 | 6.15 | 5.70 | 5.52 | 5.26 |
| 49 | 2.54 | 2.53 | 2.35 | 2.35 | 78 | 6.42 | 5.89 | 5.78 | 5.46 |
| 50 | 2.59 | 2.59 | 2.40 | 2.39 | 79 | 6.71 | 6.09 | 6.05 | 5.67 |
| 51 | 2.65 | 2.64 | 2.44 | 2.44 | 80 | 7.01 | 6.29 | 6.35 | 5.89 |
| 52 | 2.71 | 2.70 | 2.50 | 2.49 | 81 | 7.33 | 6.49 | 6.66 | 6.11 |
| 53 | 2.78 | 2.77 | 2.55 | 2.55 | 82 | 7.67 | 6.68 | 7.00 | 6.33 |
| 54 | 2.84 | 2.83 | 2.61 | 2.60 | 83 | 8.02 | 6.88 | 7.36 | 6.55 |
| 55 | 2.91 | 2.90 | 2.67 | 2.66 | 84 | 8.39 | 7.07 | 7.74 | 6.77 |
| 56 | 2.99 | 2.97 | 2.73 | 2.72 | 85 | 8.78 | 7.26 | 8.15 | 6.99 |
| 57 | 3.07 | 3.05 | 2.80 | 2.79 | 86 | 9.19 | 7.44 | 8.57 | 7.20 |
| 58 | 3.15 | 3.13 | 2.87 | 2.86 | 87 | 9.61 | 7.62 | 9.02 | 7.40 |
| 59 | 3.24 | 3.22 | 2.94 | 2.93 | 88 | 10.04 | 7.79 | 9.48 | 7.60 |
| 60 | 3.33 | 3.31 | 3.02 | 3.01 | 89 | 10.49 | 7.95 | 9.95 | 7.79 |
| 61 | 3.43 | 3.40 | 3.10 | 3.09 | 90 | 10.94 | 8.09 | 10.43 | 7.96 |
| 62 | 3.54 | 3.50 | 3.19 | 3.17 | 91 | 11.41 | 8.23 | 10.92 | 8.12 |
| 63 | 3.65 | 3.60 | 3.29 | 3.27 | 92 | 11.89 | 8.35 | 11.42 | 8.26 |
| 64 | 3.77 | 3.72 | 3.38 | 3.36 | 93 | 12.38 | 8.45 | 11.94 | 8.37 |
| 65 | 3.89 | 3.83 | 3.49 | 3.46 | 94 | 12.89 | 8.53 | 12.47 | 8.47 |
| 66 | 4.03 | 3.95 | 3.60 | 3.57 | 95 | 13.41 | 8.59 | 13.02 | 8.55 |
| 67 | 4.17 | 4.08 | 3.72 | 3.69 | 96 | 13.93 | 8.65 | 13.58 | 8.61 |
| 68 | 4.32 | 4.22 | 3.85 | 3.81 | 97 | 14.45 | 8.68 | 14.13 | 8.66 |
| 69 | 4.48 | 4.36 | 3.99 | 3.94 | 98 | 14.94 | 8.71 | 14.65 | 8.70 |
| 70 | 4.65 | 4.51 | 4.14 | 4.07 | 99 | 15.37 | 8.73 | 15.12 | 8.72 |
| 71 | 4.83 | 4.66 | 4.30 | 4.22 | 100 | 15.75 | 8.74 | 15.54 | 8.73 |
| 72 | 5.02 | 4.82 | 4.47 | 4.37 | | | | | |
| 73 | 5.22 | 4.98 | 4.65 | 4.53 | | | | | |

140. Gainbridge's contractual promises—including specifically the initial Guaranteed Interest Rate, the Minimum Guaranteed Interest Rate, the minimum monthly payment promises (once annuitized), and the death benefit—were all guaranteed and backed by the general account

of Gainbridge, and thus the financial soundness of the general account was material to the terms of the SteadyPace Single Premium Individual Deferred Annuities that Plaintiff purchased.

141. Prior to and in the process of Plaintiff purchasing those annuities between March 8 and May 9, 2024, Gainbridge made representations—on its website, in brochures, and in communications to Plaintiff—regarding its financial strength, credit rating, and ability to pay promises made in the annuity contract that were inaccurate. Specifically, those representations were inaccurate because they were based on false information that Gainbridge had filed, and its officers had sworn to, in mandatory state insurance filings regarding the extent of related-party investments in Gainbridge's general account.

142. Indeed, the very credit ratings promoted by Gainbridge were only achieved because credit rating agencies had assessed Gainbridge's credit based on Gainbridge's false annual statements. Plaintiff and the Class bought an annuity from a far riskier, and less credit-worthy, insurer than what Gainbridge had falsely portrayed itself as via its annual statements.

143. Due to the surrender/withdrawal charges and market value adjustments that Plaintiff would be subjected to if he were to surrender his annuity or withdraw his account, Plaintiff cannot rescind his Gainbridge contract without losing a considerable amount of his premium and/or accumulated interest.

144. The premiums Gainbridge collected from Plaintiff and the members of the Proposed Class allowed Gainbridge to accumulate substantial assets within its general account. As of June 30, 2026, Gainbridge reported $1.87 billion in assets under management.

**E. How Clear Spring and Gainbridge Used Their General Accounts**

145. As demonstrated above, Clear Spring and Gainbridge did not invest their general accounts in independent, investment-grade, fixed-income securities negotiated in arm's-length transactions.

146. Instead, Walter-controlled investment advisers or managers such as GPIM used the annuity premiums Plaintiff and proposed Class Members paid to Clear Spring and Gainbridge as cheap, readily available financing for other Walter-controlled businesses. The Walter-controlled entities and officers responsible for the accuracy of Clear Spring's and Gainbridge's annual reports concealed this pattern of self-dealing in those reports to the NAIC and state insurance regulators, and, by extension, concealed the extent of related-party investments in Clear Spring's and Gainbridge's general accounts from both rating agencies and the Class.

147. Both Clear Spring and Gainbridge used Walter-controlled GPIM as an investment manager. GPIM is a subsidiary of Guggenheim Capital, which Mark Walter controls. Clear Spring's annual statements state that GPIM "provides investment management services" to Clear Spring; Gainbridge similarly indicated that GPIM has provided "investment management services for certain of" Gainbridge's investments. In other words, GPIM, a Walter-controlled entity, helped manage the investments in Clear Spring's and Gainbridge's general accounts, including the undisclosed related-party investments.

148. Clear Spring also used IMS, formerly Guggenheim Insurance Services, LLC, for accounting, compliance, and reporting functions related to its general account. IMS is a wholly owned subsidiary of TWG Financial Holdings, LLC, which is a wholly owned subsidiary of TWG Global, LLC, controlled by its founder, CEO, and President, Mark Walter. Thus, IMS, a Walter-controlled entity, handled accounting, compliance, and reporting for Clear Spring's general account, which was also controlled by Walter.

149. Oversight of both Clear Spring and Gainbridge was minimal, at best. Their annual statements show that their respective nominally independent boards consisted of the same three individuals, all of whom had ties to Walter's Guggenheim Partners: Dennis A. Cullen, a former

Managing Director for Guggenheim Partners; Curtis P. Steger, a former Vice President of Product Management for Guggenheim Partners; and Michael K. Moran, a former Managing Director of Guggenheim Partners. The bylaws of Clear Spring and Gainbridge required at least three directors, so their boards had the minimum permitted number. No officer of either Clear Spring or Gainbridge, including their shared Chief Executive Officer, Daniel Towriss, served on the respective boards.

150. The result was that Walter-controlled investment advisers invested funds in Clear Spring's and Gainbridge's general accounts in Walter-controlled businesses—investments that were obviously related-party investments. Walter-controlled entities and the Signatory Officer Defendants inaccurately identified those investments as non-affiliated in Clear Spring's and Gainbridge's sworn annual statements to the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators. The Signatory Officer Defendants signed and swore to the accuracy of the annual statements and their compliance with NAIC accounting standards. The directors, all formerly of Walter-controlled Guggenheim Partners, permitted this conduct.

151. Clear Spring's original 2025 Annual Statement, Schedule D (at E10.2-E10.3), identifies two "unaffiliated" corporate bonds with American Media Productions LLC (CUSIPs 02744*-AA-5 and 02744*-AB-3), with carrying values of $155 million and $154,842,467—a total of nearly $310 million. These were among the largest bond holdings in Clear Spring's general account and were acquired on December 23, 2021.

152. American Media Productions LLC, however, is a Delaware LLC with its registered address at 1000 Elysian Park Avenue, Los Angeles, California 90012—the address of Dodger Stadium, home of the Los Angeles Dodgers. Mark Walter owns the Dodgers, which are part of

TWG Global's portfolio. American Media Productions LLC owns SportsNet LA, the regional television channel that carries Los Angeles Dodgers baseball games.

153. Under the unambiguous terms of SSAP No. 25, the hundreds of millions of dollars of bonds that Clear Spring held in American Media Productions LLC were related-party investments—loans made to companies controlled by Mark Walter and TWG Global, just as Clear Spring was. Yet, until June 2026, Clear Spring inaccurately reported these holdings as unaffiliated in its annual statements.

154. Clear Spring's reclassifications show that this pattern repeated: Clear Spring invested its general account heavily in other business interests of Walter and TWG Global, using the general account to provide billions of dollars of financing for those interests, without disclosing those investments to the NAIC, the Indiana and Delaware Departments of Insurance, rating agencies, or consumers, including Plaintiff and the proposed Class.

155. Likewise, an inspection of Gainbridge's 2025 Annual Statement Schedule D shows that it held both a $1.9 million asset-backed security—Guggenheim Corporate Funding Series 2021 (CUSIP 4017OU-AG-8)—that was a Guggenheim-managed collateralized loan obligation, and a $9.68 million issuer credit obligation—NSA Naples Trust Guggenheim NSA Napoli-M (CUSIP T6827#-AA-1)—that likewise appears to have been issued or managed by Guggenheim. Nonetheless, Gainbridge marked both of these holdings as unaffiliated in its 2025 Annual Statement Schedule D.

### F. Clear Spring and Gainbridge Misrepresentations Regarding Related-Party Exposure Pre-Date 2024

156. To-date, Clear Spring and Gainbridge have only reclassified their 2024 Annual Statement and 2025 Annual Statement to correct misrepresentations and disclose the related-party investment exposure of their respective general accounts.

157. However, Plaintiff's counsel's investigation has discovered that Clear Spring and Gainbridge were falsely characterizing related-party investments as "unaffiliated" in annual statements dating back much further—at least back to 2017 in the case of Clear Spring (then operating as Guggenheim Life and Annuity Company). These misrepresented investments represented some of the largest holdings of Clear Spring's and Gainbridge's general accounts.

158. Insurers such as Clear Spring and Gainbridge are not only required to file annual statements with the NAIC and state insurance regulators such as the Indiana and Delaware Departments of Insurance, but are also required to file less detailed, sworn quarterly statements that include Schedule BA-Part 3 (other long-term invested assets disposed, transferred or repaid during the current quarter) and Schedule D-Part 4 (long-term bonds and stocks sold, redeemed, or otherwise disposed of during the current quarter). When disposing of such positions, insurers are required to indicate whether the positions are "affiliated" as related-party investments, or "unaffiliated" as independent, non-related-party investments.

159. Clear Spring and Gainbridge filed their Q1 2026 Quarterly Statements (for the quarter ending March 31, 2026) on June 17, 2026, and filed their Q2 2026 Quarterly Statements (for the quarter ending June 30, 2026) on August 5, 2026. Similar to their annual statements, the Q1 2026 and Q2 2026 Quarterly Statements listed: (1) Walter as the controlling person of Clear Spring and Gainbridge; and (2) were signed and sworn to as to their accuracy by Signatory Officer Defendants Wang, Bloom, and Nettleton.

160. Yet both the Q1 2026 and Q2 2026 Quarterly Statements for both Clear Spring and Gainbridge identified long-term investments that had been disposed of as "affiliated" related-party investments that had, in previous years' annual statements, been identified as "unaffiliated."

161. For instance, Clear Spring's Q1 and Q2 2026 Quarterly Statements identified over $417.4 million in "affiliated" or related-party investments that had been disposed, transferred or repaid (Schedule BA-Part 3) or sold, redeemed, or otherwise disposed of (Schedule D-Part 4) during those quarters:

| CUSIP | Issuer Name | Schedule | Status | Quarterly Report | Book Value |
|---|---|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | D Part 4 | Affiliated | Q1 2026 | $3,285,388 |
| 26505#-AA-9 | Duncan Mills Sec NT Issuer LLC Series 20 | D Part 4 | Affiliated | Q1 2026 | $505,250 |
| 94136#-AA-4 | Waterford Capital Investors LLC | D Part 4 | Affiliated | Q1 2026 | $6,023,088 |
| 00300Q-AA-7 | Aberdeen Asset Trust Class A1 | D Part 4 | Affiliated | Q1 2026 | $28,675,000 |
| 058656-AA-7 | Ballinshire Capital Funding Tr Class A1 | D Part 4 | Affiliated | Q1 2026 | $70,656,000 |
| 430700-AA-2 | Highland Peak Trust Class A1 | D Part 4 | Affiliated | Q1 2026 | $62,666,000 |
| 612654-AA-1 | Monterra Trust Class A1 | D Part 4 | Affiliated | Q1 2026 | $22,919,000 |
| BGH3AR-GK-8 | Calshot Collateral Co I LLC | BA Part 3 | Affiliated | Q2 2026 | $3,587,200 |
| 26508#-AA-6 | Duncannon Funding Company LLC | BA Part 3 | Affiliated | Q2 2026 | $20,500,000 |
| BGH39E-PQ-6 | Hattersfield Holdings LLC | BA Part 3 | Affiliated | Q2 2026 | $45,023,680 |
| BGH39E-PR-4 | Hexton Financial Holdings LLC | BA Part 3 | Affiliated | Q2 2026 | $50,000,000 |
| 00863#-AB-8 | Aguila Holdings LLC | D Part 4 | Affiliated | Q2 2026 | $57,500,000 |
| 03154*-AA-6 | Amistad Debt Warehouse 1 LLC | D Part 4 | Affiliated | Q2 2026 | $1,187,500 |
| 10422@-AA-5 | Bradford Allen Enterprises | D Part 4 | Affiliated | Q2 2026 | $44,875,002 |
| | | | | **TOTAL:** | **$417,403,108** |

162. Yet prior, sworn annual statements filed by Clear Spring with the NAIC and state insurance regulators that have not yet been corrected show these same investments being listed as "unaffiliated" or non-related-party investments dating back at least as early as 2017:

| CUSIP | Issuer Name | Status | Prior Annual Statements Listed as Unaffiliated |
|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | Unaffiliated | 2020-2025 |

| CUSIP | Issuer Name | Status | Prior Annual Statements Listed as Unaffiliated |
|---|---|---|---|
| 26505#-AA-9 | Duncan Mills Sec NT Issuer LLC Series 20 | Unaffiliated | 2021-2025 |
| 94136#-AA-4 | Waterford Capital Investors LLC | Unaffiliated | 2023-2025 |
| 00300Q-AA-7 | Aberdeen Asset Trust Class A1 | Unaffiliated | 2017-2025 |
| 058656-AA-7 | Ballinshire Capital Funding Tr Class A1 | Unaffiliated | 2017-2025 |
| 430700-AA-2 | Highland Peak Trust Class A1 | Unaffiliated | 2017-2025 |
| 612654-AA-1 | Monterra Trust Class A1 | Unaffiliated | 2017-2025 |
| BGH3AR-GK-8 | Calshot Collateral Co I LLC | Unaffiliated | 2017-2025 |
| 26508#-AA-6 | Duncannon Funding Company LLC | Unaffiliated | 2017-2025 |
| BGH39E-PQ-6 | Hattersfield Holdings LLC | Unaffiliated | 2017, 2019-2025 |
| BGH39E-PR-4 | Hexton Financial Holdings LLC | Unaffiliated | 2017, 2019-2025 |
| 00863#-AB-8 | Aguila Holdings LLC | Unaffiliated | 2020-2025 |
| 03154*-AA-6 | Amistad Debt Warehouse 1 LLC | Unaffiliated | 2024-2025 |
| 10422@-AA-5 | Bradford Allen Enterprises | Unaffiliated | 2017-2025 |

163. This means that Clear Spring's annual statements dating back to 2017—including annual statements in place when Plaintiff purchased his Clear Spring annuity—all materially and inaccurately understated the related-party investments in Clear Spring's general accounts, by at least the amount of the investments that have since been disclosed as being related-party investments identified above. Plaintiff alleges, on information and belief as informed by the evidence above, that there are millions (if not billions) of additional undisclosed related-party investments in Clear Spring's annual statements for 2017-2023 that have not yet been corrected.

164. Gainbridge displays the same pattern. Gainbridge's Q1 2026 and Q2 2026 Quarterly Statements list over $6.2 million in "affiliated" related-party investments that Gainbridge disposed of, transferred, or had repaid (Schedule BA-Part 3) or sold, redeemed, or otherwise disposed of (Schedule D-Part 4) during those quarters:

| CUSIP | Issuer Name | Schedule | Status | Quarterly Report | Book Value |
|---|---|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | D Part 4 | Affiliated | Q1 2026 | $169,934 |

| CUSIP | Issuer Name | Schedule | Status | Quarterly Report | Book Value |
|---|---|---|---|---|---|
| 26605#-AA-9 | Duncan Mills SEC NT Issuer LLC | D Part 4 | Affiliated | Q1 2026 | $21,500 |
| BGH3AR-GK-8 | Calshot Collateral Co I LLC | BA Part 3 | Affiliated | Q2 2026 | $1,247,444 |
| BGH39E-PQ-6 | Hattersfield Holdings LLC | BA Part 3 | Affiliated | Q2 2026 | $2,400,000 |
| BGH39E-PR-4 | Hexton Financial Holdings LLC | BA Part 3 | Affiliated | Q2 2026 | $2,400,000 |
| | | | | **TOTAL:** | **$6,238,878** |

165. Yet those very same investments had appeared on Gainbridge's past sworn and filed annual statements as "unaffiliated" and non-related-party investments, including at least the following annual statements that Gainbridge has not yet corrected:

| CUSIP | Issuer Name | Status | Prior Annual Statements Listed as Unaffiliated |
|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | Unaffiliated | 2022-2025 |
| 26605#-AA-9 | Duncan Mills SEC NT Issuer LLC | Unaffiliated | 2022-2025 |
| BGH3AR-GK-8 | Calshot Collateral Co I LLC | Unaffiliated | 2022-2025 |
| BGH39E-PQ-6 | Hattersfield Holdings LLC | Unaffiliated | 2022-2025 |
| BGH39E-PR-4 | Hexton Financial Holdings LLC | Unaffiliated | 2022-2025 |

166. This means that Gainbridge's annual statements dating back at least to its 2022 annual statement—including the annual statements that were in force and had been filed just before Plaintiff purchased his Gainbridge annuities—all materially misstated the concentration of related-party investments in Gainbridge's general account. Plaintiff alleges, on information and belief as informed by the evidence above, that Gainbridge's annual statements for 2022-2023 (at minimum) conceal millions (if not hundreds of millions) of additional related-party investments that Gainbridge has not yet corrected.

### G. Clear Spring's and Gainbridge's Use of "Cutouts" to Conceal Related-Party Investments

167. As discussed above, financial media have reported that federal investigators are investigating whether Clear Spring and Gainbridge (as well as Delaware Life) used so-called "cutouts"—nominally independent third parties who were used to conceal the fact that general-account assets of the insurers were being funneled to Walter-controlled related-party investments. Plaintiff's counsel's investigation has developed evidence suggesting that they were.

168. An August 16, 2026 article by Joe Wallace, Justin Baer, and Margot Patrick in the Wall Street Journal (https://www.wsj.com/finance/prosecutors-focus-on-four-businesses-tied-to-dodgers-owner-mark-walter-965e382b, last visited Oct. 2, 2026) reported that federal investigators were investigating whether certain entities—including Amistad Financial, an investment company that owns EquiTrust, a life insurer once controlled by Guggenheim and Walter; Bradford Allen, a Chicago-based commercial real-estate broker with long ties to Guggenheim; and Hudson Trading, Inc., another Chicago firm—had "served as intermediaries between insurance companies he controlled that made loans to businesses that he also controlled."

169. Clear Spring's and Gainbridge's Q1 2026 and Q2 2026 Quarterly Statements have seemingly confirmed these reported suspicions of federal investigators. Over $58.2 million of investments issued by Amistad Financial, Bradford Allen, and Hudson Trading, Inc.[8] were listed as being sold, redeemed, or otherwise disposed of (Schedule D-Part 4) in Clear Spring's and Gainbridge's Q1 2026 and Q2 2026 Quarterly Statements as "affiliated" related-party investments, despite the fact that they had previously been listed as "unaffiliated" (per the above) on annual statements going back at least as long as 2017:

[8] Per an August 6, 2026 report in Crain's Chicago Business by reporters Zachary Mider, Weihua Li, and Ava Benny-Morrison (https://www.chicagobusiness.com/banking-finance/ccb-mark-walter-hudson-trading-probe-20260806/, last visited Oct. 2, 2026), both Albany Financial LLC and Waterford Capital Investors LLC use an address associated with Hudson Trading, Inc.

| CUSIP | Issuer Name | Insurer | Quarterly Report | Book Value |
|---|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | Clear Spring | Q1 2026 | $3,285,388 |
| 94136#-AA-4 | Waterford Capital Investors LLC | Clear Spring | Q1 2026 | $6,023,088 |
| 03154*-AA-6 [9] | Amistad Debt Warehouse 1 LLC | Clear Spring | Q1 2026 | $2,750,000 |
| 03154*-AA-6 | Amistad Debt Warehouse 1 LLC | Clear Spring | Q2 2026 | $1,187,500 |
| 10422@-AA-5 | Bradford Allen Enterprises | Clear Spring | Q2 2026 | $44,875,002 |
| 01220#-AA-6 | Albany Financial LLC | Gainbridge | Q1 2026 | $169,934 |
| | | | **TOTAL:** | **$58,290,912** |

170. But Clear Spring's and Gainbridge's quarterly reports only tell the story of investments the insurers have disposed of in 2026. Looking at the 2025 Annual Statements of Clear Spring and Gainbridge, both insurers apparently still retain millions of dollars of investments in their general accounts that appear to have been issued by Amistad, Bradford Allen, or Hudson Trading, Inc. that were identified as unaffiliated on past annual statements dating back to at least 2020:

| CUSIP | Issuer Name | Insurer | Prior Annual Statements Listed as Unaffiliated | Retained Book Value [10] |
|---|---|---|---|---|
| 01220#-AA-6 | Albany Financial LLC | Clear Spring | 2020-2025 | $39,995,315* |
| 94136#-AA-4 | Waterford Capital Investors LLC | Clear Spring | 2023-2025 | $57,476,912* |
| 03154*-AA-6 | Amistad Debt Warehouse 1 LLC | Clear Spring | 2023-2025 | $39,362,500* |
| N/A [11] | Amistad Corp. Finance Holdings LLC | Clear Spring | 2025 | $36,500,000 |

[9] On Clear Spring's Q1 2026 Quarterly Statement, a $2,750,000 disposed investment in Amistad Debt Warehouse 1 LLC was confusingly listed twice: once as "unaffiliated" (on page E05.1), and then as "affiliated" (on page E05.3). For purposes of this analysis, the complaint assumes the former "unaffiliated" entry was an error, and that the latter $2,750,000 disposal of this "affiliated" investment is the only one that occurred.

[10] Where applicable (indicated by *), this number is determined by taking the 2025 Annual Statement book value of the identified investment and subtracting the book value of any amount disposed of per the insurers' Q1 2026 and Q2 2026 Quarterly Statements.

[11] Investment listed on Schedule DA-Part 1 as a short-term investment owned December 31, 2025 with no associated CUSIP.

| CUSIP | Issuer Name | Insurer | Prior Annual Statements Listed as Unaffiliated | Retained Book Value [10] |
|---|---|---|---|---|
| 10422#-AB-1 | Bradford Allen Secured Funding | Clear Spring | 2025 | $35,000,000 |
| N/A [12] | Bradford Allen Funding Company | Clear Spring | 2025 | $25,000,000 |
| N/A [13] | Bradford Allen Term Capital V | Clear Spring | 2025 | $25,000,000 |
| N/A [14] | Bradford Allen Term Investors | Clear Spring | 2025 | $41,750,000 |
| BES2MD-2J-3 | Bradford Allen Cred. Fund Inves. | Clear Spring | 2021-2025 | $78,868,260 |
| 01220#-AA-6 | Albany Financial LLC | Gainbridge | 2022-2025 | $2,068,723* |
| N/A [15] | Amistad STF II LLC | Gainbridge | 2025 | $10,000,000 |
| N/A [16] | Bradford Allen Term Capital IV STL | Gainbridge | 2025 | $10,000,000 |

### H. The Fallout

171. The fallout from the SEC and United States Attorney's Office investigations, and from Clear Spring's and Gainbridge's reclassifications of their general accounts, has been swift and significant. It demonstrates both the material nature of the misrepresentations regarding related-party investments and the damages to annuitants who purchased fixed and fixed-indexed annuities based on the false impression of financial soundness created by Clear Spring's and Gainbridge's inaccurate annual statements.

172. Following Clear Spring's and Gainbridge's reclassification of related-party investments held in their general accounts, S&P Global revised its outlook for Group 1001 insurers, including Clear Spring, Gainbridge, and Delaware Life, from "stable" to "negative" on or about July 14, 2026; Fitch placed Clear Spring's ratings on negative watch on or about July 22,

[12] *See supra* n.11.
[13] *See supra* n.11
[14] *See supra* n.11.
[15] *See supra* n.11.
[16] *See supra* n.11.

2026; and AM Best assigned a negative outlook to both Clear Spring and Gainbridge on or about July 31, 2026. Reports suggest that these rating agencies may even lower Clear Spring's and/or Gainbridge's A- credit rating as a result. Each agency assesses the claims-paying ability that Clear Spring and/or Gainbridge represented to purchasers, and each changed its assessment only after learning what purchasers were never told about the high concentration of related-party investments in Clear Spring's and Gainbridge's general accounts. In other words, rating agencies have confirmed the materiality of Clear Spring's and Gainbridge's misrepresentations of related-party investments.

173. In late August 2026, two national banks that sold Clear Spring fixed and fixed-indexed annuities—Truist Financial Corporation and Fifth Third Bancorp—paused sales to customers in light of concerns regarding Clear Spring's financial quality raised by the federal investigations into Clear Spring's related-party holdings and Clear Spring's restatements of its Annual Statements. In other words, sophisticated financial entities that had, to that point, sold Clear Spring fixed and fixed-indexed annuities to their customers concluded that the concealed concentration and Clear Spring's misrepresentations regarding it were material enough to stop selling the products.

174. Financial media have since reported that Walter sold his stake in the Los Angeles Lakers just over a year after buying it and similarly sold his stakes in English Premier League soccer team Chelsea F.C. These efforts occurred as Walter's TWG Global reportedly approached investors to raise cash to pay down or restructure loans held by Clear Spring, Gainbridge, and Delaware Life, allegedly offering double-digit yields and/or an equity stake in Walter's Guggenheim Partners as collateral. According to separate Wall Street Journal reports, "the current situation has left Walter scrambling for cash, because his insurance companies have a plan to

dispose of or restructure most of those Walter-related investments by the end of 2026," with Walter "racing to sell or unwind many of those undisclosed loans to head off ratings downgrades that would scare off policy buyers."

175. These remedial moves by Walter, as the control person of both Clear Spring and Gainbridge, to address regulators' concerns, appease rating agencies, and unwind related-party investments demonstrate the materiality of the misrepresentations and omissions in Clear Spring's and Gainbridge's sworn annual statements filed with state insurance departments, and the breach of their promises regarding the quality of their respective general accounts as financial backing for these annuities.

176. Moreover, selling related-party assets to correct these misrepresentations and omissions risks exposing Clear Spring's and Gainbridge's general accounts to additional losses and financial instability. AM Best, Fitch, and S&P Global have all noted execution risk in Clear Spring's and Gainbridge's remedial plans for restructuring the related-party assets and that the remediation itself could weaken the insurers' respective balance sheets or result in higher credit-risk asset charges following the restructuring. Clear Spring and Gainbridge may be forced to sell related-party assets at market prices below the values they claimed when entering into or valuing them, sell at distressed prices because of the emergency need to stabilize the general account, or pay more in the future in risk asset charges as a result of the restructuring—all of which will further weaken the value of Clear Spring's and Gainbridge's respective general accounts.

## CLASS ALLEGATIONS

177. Plaintiff brings this action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> **All persons and entities who purchased, acquired, or made a payment toward a fixed annuity (including but not limited to multi-year guaranteed annuities) or fixed-**

**indexed annuity issued by Clear Spring Life and Annuity Company (or its predecessor Guggenheim Life and Annuity Company) or Gainbridge Life Insurance Company during the period from July 1, 2016, through June 30, 2026 (the "Class Period").**

178. Excluded from the Class are Defendants; the officers, directors, and immediate family members of any Defendant; any entity in which a Defendant has or had a controlling interest; any entity or person who held a controlling interest in any Defendant; any judges or justices involved in this action and any members of their immediate families or their staff; and the legal representatives, heirs, successors, and assigns of any excluded person or entity.

179. Plaintiff reserves the right to amend the Class definition, including to add subclasses as necessary, before trial.

180. ***Numerosity.*** The Class comprises tens of thousands of purchasers of annuities from Clear Spring and Gainbridge and is so numerous that joinder is impracticable. During the Class Period, Clear Spring and Gainbridge sold billions of dollars of annuities. The precise number and identity of Class members are ascertainable from Clear Spring's and Gainbridge's records, including contract administration records.

181. ***Commonality and Predominance.*** Common questions of law and fact predominate over any individual questions, including but not limited to:

(a) whether the private-credit investments at issue were related-party investments under SSAP No. 25;

(b) whether Clear Spring and Gainbridge misclassified and/or concealed those investments under applicable statutory-accounting principles;

(c) the true related-party concentration and financial condition of Clear Spring and Gainbridge once the investments are properly classified;

(d) whether Clear Spring's and Gainbridge's representations of their respective financial strength were materially false or misleading;

(e) whether Clear Spring and Gainbridge breached their respective contracts with the Class, insofar as the general-account assets backing their annuities were not as represented;

(f) whether the annuities were worth less than represented and the classwide measure of that overpayment;

(g) whether Clear Spring, Gainbridge, Walter, and/or the Signatory Officer Defendants committed fraud under Ind. Code § 35-43-5-4 by knowingly or intentionally making false or misleading statements or by creating a false impression in others with the intent to obtain premiums from Plaintiff and the Class;

(h) whether Plaintiff and the Class suffered a pecuniary loss as a result of Defendants' violation of Ind. Code § 35-43-5-4;

(i) whether Plaintiff and the Class are entitled to damages, treble damages, costs and expenses, reasonable attorneys' fees pursuant to Ind. Code § 34-24-3-1, rescission, and/or declaratory and injunctive relief.

182. ***Typicality.*** Plaintiff's claims are typical of the Class because all members were injured by the same uniform course of conduct: Clear Spring and Gainbridge misclassified and concealed related-party investments in their sworn annual statements, thereby misrepresenting the financial strength on which the sale and pricing of the Clear Spring and Gainbridge annuities depended. All Class members, like Plaintiff, were exposed to the same misrepresentations and suffered the same form of injury.

183. ***Adequacy.*** Plaintiff will fairly and adequately protect the interests of the Class, has no interests antagonistic to the Class, and has retained counsel experienced in complex class litigation related to financial instruments such as the annuities at issue.

184. ***Predominance.*** Common issues predominate in this litigation under Rule 23(b)(3). The misrepresentations were uniform, derived from centrally prepared documents and centrally reported financial data, and the damages measure is common across the Class and susceptible to formulaic calculation by product line and purchase date.

185. ***Superiority.*** A class action is superior to other methods for the fair and efficient adjudication of this controversy. Individual damages, though substantial to each purchaser, are small relative to the cost of litigating against Clear Spring, Gainbridge, Walter, and the Signatory Officer Defendants, and classwide treatment avoids inconsistent adjudications and conserves judicial resources. Defendants have acted on grounds generally applicable to the Class, making final declaratory and injunctive relief appropriate for the Class as a whole under Rule 23(b)(2). Where individual questions exist, the Court may certify issue classes under Rule 23(c)(4).

## CLAIMS FOR RELIEF

## COUNT ONE

### Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing (Against Clear Spring and Gainbridge)

186. Plaintiff incorporates the preceding paragraphs by reference.

187. Plaintiff and the proposed Class purchased the annuities at issue from Clear Spring and Gainbridge, respectively, paying as consideration for those annuities the premiums specified for each policy.

188. In exchange for the consideration paid as premiums by Plaintiff and the proposed Class for their annuities, Clear Spring and Gainbridge contracted to and made promises in the annuity contracts—including but not limited to guaranteed interest rates during guaranteed periods, minimum guaranteed interest rates subsequent to guaranteed periods, monthly annuity payments (once annuitized), and death benefits—that were guaranteed by the respective general accounts of Clear Spring and Gainbridge, and the credit and risk characteristics of those general accounts.

189. Because these annuities were insurance contracts, Indiana insurance laws in force when each annuity contract was made are incorporated into each contract as implied and required terms as a matter of law.

190. Those laws incorporated into the annuity contracts that Plaintiff and the proposed Class purchased from Clear Spring and Gainbridge include requirements: (a) that Clear Spring and Gainbridge file accurate annual statements each year with the NAIC and Indiana Department of Insurance, verified under oath by their officers (Indiana Code §§ 27-1-20-21, 27-1-20-22, and 27-1-20-33); (b) that Clear Spring's and Gainbridge's annual statements comply with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual, including SSAP No. 25's requirement that related-party investments be identified and disclosed (Indiana Code § 27-1-3-13); and (c) that Clear Spring's and Gainbridge's transactions with affiliates and related parties be on fair and reasonable terms, and be recorded accurately in their respective books and records (including their filed annual statements) in a manner that "clearly and accurately disclose[d] the nature and details of the transactions" (Indiana Code § 27-1-23-4).

191. Through these incorporated statutory terms, Clear Spring and Gainbridge each agreed to maintain and administer the general account backing the guarantees contained in the annuity contracts in compliance with Indiana's disclosure requirements for related-party investments.

192. Each also agreed to represent the composition of that general account truthfully and accurately in the sworn annual statements that Indiana law requires. Those annual statements are the statutory instrument through which Clear Spring and Gainbridge represented what assets actually backed their contractual guarantees.

193. Indiana law also implies a covenant of good faith and fair dealing in every insurance contract, resulting from the unique nature of the insured/insurer relationship, that includes the obligation to refrain from deceiving the insured.

194. Clear Spring and Gainbridge represented in sworn, statutorily mandated annual financial statements to the NAIC, the Indiana Department of Insurance, the Delaware Department of Insurance, and other state insurance regulators that the general accounts backing the annuities Plaintiff and the proposed Class purchased contained high-quality, independent, investment-grade assets and that related-party holdings were immaterial in amount.

195. The annuity contracts that Plaintiff and the proposed Class entered into with Clear Spring and Gainbridge obligated those companies to maintain and administer the general accounts backing the contracts in accordance with the contract terms, the representations incorporated into them, including representations incorporated from their sworn annual statements, and applicable state laws and NAIC rules.

196. Clear Spring and Gainbridge breached their contractual obligations and breached their implied covenant of good faith and fair dealing by investing general-account assets in related-party investments far in excess of what they disclosed or applicable law permitted and by misreporting those investments in sworn, statutorily required annual statements to the NAIC, the Indiana Department of Insurance, the Delaware Department of Insurance, and other state insurance regulators that were incorporated into the annuity contracts as a matter of law.

197. As a result, Clear Spring and Gainbridge did not deliver annuities to Plaintiff and the proposed Class with the general-account credit and risk characteristics represented by their sworn, annual statements. By doing so, they breached their contracts with Plaintiff and the proposed Class.

198. Plaintiff and the proposed Class purchased annuities that were inferior to what they paid for and had contracted with Clear Spring and Gainbridge to receive. Plaintiff and the proposed Class would have paid less for, and/or would have received more favorable interest rates or other terms on, the annuity contracts as delivered with the general-account credit and risk characteristics as they actually were at the time of purchase.

199. Additionally, should Plaintiff or the proposed Class attempt to rescind their annuity contracts now, they will be harmed as surrender/withdrawal charges and market value adjustment terms in the contract would result in the rescinding annuitants receiving less than their full premiums and accrued interest.

200. As a result of Clear Spring's and Gainbridge's breaches of contract and breaches of the covenant of good faith and fair dealing, Plaintiff and the proposed Class received less than the full contractual benefit for which they bargained, were damaged, and are entitled to rescission and/or compensatory damages.

## COUNT TWO

**<u>Violation of the Indiana Crime Victims Relief Act</u>**
**<u>Ind. Code § 34-24-3-1 and Ind. Code § 35-43-5-4</u>**
**(Against All Defendants)**

201. Plaintiff realleges and incorporates the preceding paragraphs by reference.

202. Defendants, with intent to obtain property, knowingly or intentionally made false or misleading statements or created a false impression in another person in violation of Indiana Code § 35-43-5-4.

203. On February 14, 2025, Clear Spring filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators its Annual Statement for the Year Ended December 31, 2024 ("2024 Clear Spring Annual Statement"). The 2024 Clear Spring Annual Statement identified Defendant Walter as "the ultimate controlling person of the Group

1001 insurance holding company system" that included Clear Spring. Defendants Towriss and Nettleton signed and swore that the 2024 Clear Spring Annual Statement was a "full and true statement of all the assets and liabilities and of the condition and affairs" of Clear Spring, and was "completed in accordance with the NAIC Annual Statement Instructions and Account Practices and Procedures manual." For the reasons detailed above, and as confirmed by Clear Spring's reclassification, the 2024 Clear Spring Annual Statement was false and misleading in regards to the concentration of related-party investments contained in Clear Spring's general account, and created the false impression that Clear Spring's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments.

204. On February 18, 2026, Clear Spring filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators its Annual Statement for the Year Ended December 31, 2025 ("2025 Clear Spring Annual Statement"). The 2025 Clear Spring Annual Statement identified Defendant Walter as "the ultimate controlling person of the Group 1001 insurance holding company system" that included Clear Spring. Defendants Wang, Bloom, and Nettleton signed and swore that the 2025 Clear Spring Annual Statement was a "full and true statement of all the assets and liabilities and of the condition and affairs" of Clear Spring, and was "completed in accordance with the NAIC Annual Statement Instructions and Account Practices and Procedures manual." For the reasons detailed above, and as confirmed by Clear Spring's reclassification, the 2025 Clear Spring Annual Statement was false and misleading in regards to the concentration of related-party investments contained in Clear Spring's general account, and created the false impression that Clear Spring's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments.

205. As alleged above, Plaintiff's Counsel's investigation has determined that prior Clear Spring Annual Statements dating back at least to the 2017 Clear Spring Annual Statement similarly made false and misleading statements and omissions in regards to the concentration of related-party investments contained in Clear Spring's general account, and created the false impression that Clear Spring's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments. This includes the 2017 Clear Spring Annual Statement (filed February 5, 2018), the 2018 Clear Spring Annual Statement (filed February 11, 2019), the 2019 Clear Spring Annual Statement (filed February 19, 2020), the 2020 Clear Spring Annual Statement (filed February 23, 2021), the 2021 Clear Spring Annual Statement (filed February 23, 2022), the 2022 Clear Spring Annual Statement (filed February 28, 2023), and the 2023 Clear Spring Annual Statement (filed February 16, 2024).

206. On February 14, 2025, Gainbridge filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators its Annual Statement for the Year Ended December 31, 2024 ("2024 Gainbridge Annual Statement"). The 2024 Gainbridge Annual Statement identified Defendant Walter as "the ultimate controlling person of the Group 1001 insurance holding company system" that included Gainbridge. Defendants Towriss and Nettleton signed and swore that the 2024 Gainbridge Annual Statement was a "full and true statement of all the assets and liabilities and of the condition and affairs" of Gainbridge, and was "completed in accordance with the NAIC Annual Statement Instructions and Account Practices and Procedures manual." For the reasons detailed above, and as confirmed by Gainbridge's reclassification, the 2024 Gainbridge Annual Statement was false and misleading in regards to the concentration of related-party investments contained in Gainbridge's general account, and created the false

impression that Gainbridge's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments.

207. On February 18, 2026, Gainbridge filed with the NAIC, the Indiana and Delaware Departments of Insurance, and other state insurance regulators its Annual Statement for the Year Ended December 31, 2025 ("2025 Gainbridge Annual Statement"). The 2025 Gainbridge Annual Statement identified Defendant Walter as "the ultimate controlling person of the Group 1001 insurance holding company system" that included Gainbridge. Defendants Wang, Bloom, and Nettleton signed and swore that the 2025 Gainbridge Annual Statement was a "full and true statement of all the assets and liabilities and of the condition and affairs" of Gainbridge, and was "completed in accordance with the NAIC Annual Statement Instructions and Account Practices and Procedures manual." For the reasons detailed above, and as confirmed by Gainbridge's reclassification, the 2025 Gainbridge Annual Statement was false and misleading in regards to the concentration of related-party investments contained in Gainbridge's general account, and created the false impression that Gainbridge's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments.

208. As alleged above, Plaintiff's Counsel's investigation has determined that prior Gainbridge Annual Statements dating back at least to the 2022 Gainbridge Annual Statement similarly made false and misleading statements and omissions in regards to the concentration of related-party investments contained in Gainbridge's general account, and created the false impression that Gainbridge's general account was financially sound and creditworthy because it only had *de minimis* amounts of related-party investments. This includes the 2022 Gainbridge Annual Statement (filed February 28, 2023), and the 2023 Gainbridge Annual Statement (filed February 16, 2024).

209. As a direct and proximate result of Defendants' actions, Plaintiff and the Class suffered direct pecuniary losses in the millions of dollars.

210. Pursuant to Ind. Code § 34-24-3-1, Plaintiff and the Class are entitled to bring a civil action against Defendants to recover:

- An amount not to exceed three (3) times their actual/compensatory damages (treble damages);
- The costs and expenses of the action; and
- Reasonable attorneys' fees.

**COUNT THREE**

**Fraudulent Inducement/Fraudulent Misrepresentation**
**(Against All Defendants)**

211. Plaintiff realleges and incorporates the preceding paragraphs by reference.

212. In their false annual statements, Clear Spring and Gainbridge knowingly or recklessly made material misrepresentations and concealed material facts from Plaintiff and the proposed Class, as well as the NAIC, Indiana and Delaware Departments of Insurance, other state insurance regulators, and credit rating agencies, regarding the related-party concentration and true financial condition of their general accounts.

213. Clear Spring and Gainbridge also failed to disclose material facts they had a duty as sellers to disclose to buyers and state insurance regulators in their annual statements concerning the related-party concentration and true financial condition of their general accounts.

214. Walter (as controlling person of Clear Spring and Gainbridge) and the Signatory Officer Defendants all participated in or directed the making of these false annual statements, or were responsible for the investment of general account funds of the insurers in related-party transactions that violated insurance laws if not disclosed and given proper approval in advance. In

the case of the Signatory Officer Defendants, they signed and swore to the accuracy of the annual statements and their compliance with applicable NAIC accounting standards.

215. Clear Spring, Gainbridge, Walter, and the Signatory Officer Defendants intended that annuity purchasers—including Plaintiff and the proposed Class—rely on the resulting false picture of financial strength created by the annual statements when contracting to buy the annuities at the offered price and terms, including the guaranteed interest rates during guaranteed periods, minimum guaranteed interest rates subsequent to guaranteed periods, monthly annuity payments (once annuitized), and death benefits—all of which depended on the financial strength, credit, and risk of the Clear Spring and Gainbridge general accounts.

216. The representations made by Defendants that Clear Spring's and Gainbridge's general accounts were invested in high-quality, independent, investment-grade assets and that related-party holdings were immaterial in amount were false when made and were material, and Defendants knew or recklessly disregarded their falsity.

217. As sellers of these annuities, Clear Spring and Gainbridge had a duty to disclose the true composition of their general accounts because their statutorily required annual statements prepared by or directed by Defendants (and sworn by Defendants Towriss, Wang, Bloom, and Nettleton) were required by state law and NAIC rules to accurately disclose the investment composition of those accounts. Clear Spring and Gainbridge marketed the credit ratings derived from those statements by credit rating agencies as evidence of the financial strength of their general accounts to consumers, and Defendants possessed superior and exclusive knowledge of the underlying facts that demonstrated Clear Spring's and Gainbridge's general accounts were materially riskier and less creditworthy than represented because related-party investments were not accurately disclosed in the annual statements.

218. Plaintiff and the proposed Class justifiably and reasonably relied on Defendants' misrepresentations in the annual statements and on the absence of disclosure regarding the true composition of their general accounts when deciding to buy these annuities at the charged price and the interest rates and other terms provided.

219. As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff and the Class were induced to buy the annuities they purchased from Clear Spring and Gainbridge, and were damaged insofar as they paid Clear Spring and Gainbridge more than the annuities would have been worth but-for Defendants' fraud; otherwise would have bought annuities from a safer insurer with better credit and less risk in their general accounts; and are now required to pay surrender/withdrawal charges and market value adjustments if they rescind or surrender their contracts that would result in them receiving less than the full value of the premiums paid and interest accrued.

220. As a result of this fraudulent inducement, Plaintiff and the proposed Class are entitled to rescission of their contracts without surrender/withdrawal charges or market value adjustments as injunctive relief, and/or compensatory damages.

**COUNT FOUR**

**Negligent Misrepresentation**
**(Against All Defendants)**

221. Plaintiff realleges and incorporates the preceding paragraphs by reference.

222. In the alternative to Counts Two and Three, and to the extent Defendants did not make the misrepresentations and omissions in the annual statements knowingly or with the intent to deceive, Defendants negligently misrepresented the financial condition, risk, and creditworthiness of the general accounts of Clear Spring and Gainbridge, including by negligently omitting the true related-party composition of those general accounts.

223. As insurers (Clear Spring and Gainbridge), the controlling person of insurers (Walter), and officers of insurers (Signatory Officer Defendants), Defendants had a duty imposed by law (specifically Title 27 of the Indiana Code and Indiana common law) to truthfully and accurately disclose the true financial condition and composition of the general accounts of Clear Spring and Gainbridge in their mandatory annual statements, including the related-party investments contained in those general accounts. This duty further arose from the parties' contractual relationship, Defendants' superior knowledge of the investments within the general accounts of Clear Spring and Gainbridge, and the trust and confidence that annuitants such as Plaintiff and the proposed Class placed in Defendants.

224. Defendants breached their duty by directing, authorizing, preparing, supplying, attesting to, approving, or filing annual statements that did not disclose the true, significantly higher related-party concentration of general account investments for Clear Spring and Gainbridge. Defendants failed to exercise reasonable care in determining, verifying, and/or communicating the true concentration of related-party investments in the general accounts of Clear Spring and Gainbridge, and the impact this had on the ability of those general accounts to pay claims.

225. Plaintiff and the proposed Class reasonably relied on Defendants' negligent representations and omissions. This reliance was reasonable given Defendants' roles as insurers, the controlling person of the insurers, or the officers of the insurers, as well as Defendants' superior access to information regarding the true related-party concentration of the Clear Spring and Gainbridge general accounts.

226. As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiff and the proposed Class have suffered damages.

## COUNT FIVE

**<u>Unjust Enrichment</u>**
**(Against Clear Spring, Gainbridge, and Walter)**

227. Plaintiff realleges and incorporates all preceding paragraphs and pleads this Count in the alternative.

228. Plaintiff and the proposed Class conferred a benefit on Clear Spring and Gainbridge by paying premiums and charges exceeding what an informed market would have been willing to pay for fixed and fixed-indexed annuities had Clear Spring and Gainbridge accurately reported the composition of their general accounts.

229. Plaintiff and the proposed Class also conferred a benefit on Walter. The premiums they paid into Clear Spring's and Gainbridge's general accounts were diverted from the independent, investment-grade, safe securities in which they were represented as being invested, and instead were invested in Walter-controlled related parties.

230. In doing so, Plaintiff and the proposed Class unknowingly provided Walter with the benefit of financing that his controlled entities otherwise could not have secured in arm's-length transactions on the open market and/or financing on terms more favorable to Walter and the Walter-controlled related parties than those available in arm's-length transactions on the open market.

231. It would be inequitable for Clear Spring, Gainbridge, and/or Walter to retain those benefits because they obtained them through the alleged misrepresentations and concealment regarding related-party transactions in mandated Annual Statements detailed above.

232. Plaintiff and the proposed Class seek rescission of the annuity contracts, restitution, and/or disgorgement as relief for the unjust enrichment conferred upon Clear Spring, Gainbridge, and/or Walter.

## PRAYER FOR RELIEF

233. Plaintiff, on behalf of himself and the Class and for all the reasons set forth above, respectfully requests that the Court provide the following relief:

a. certify this action as a class action pursuant to Rule 23, certify the proposed Class, appoint Plaintiff as class representative, and appoint the undersigned as class counsel;

b. enter judgment for Plaintiff and the Class and against each Defendant on all counts applicable to that Defendant;

c. award rescission without payment of surrender/withdrawal charges or market value adjustments as injunctive relief or rescissory damages as monetary relief for Clear Spring's and Gainbridge's breach of contract and breach of the implied covenant of good faith and fair dealing;

d. award compensatory damages, including the difference between the consideration paid and the value of the contracts as represented, in an amount to be determined at trial, for Clear Spring's and Gainbridge's breach of contract and breach of the implied covenant of good faith and fair dealing;

e. award actual damages, including treble damages, costs, expenses, and reasonable attorneys' fees for pecuniary losses suffered by Plaintiff and the Class from Defendants' fraud in violation of Ind. Code § 35-43-5-4 pursuant to the Indiana Crime Victims Relief Act, Ind. Code § 34-24-3-1;

f. award rescission without payment of surrender/withdrawal charges or market value adjustments as injunctive relief, or rescissory/compensatory damages as monetary relief for Defendants' fraudulent inducement and fraudulent misrepresentation;

g. award (in the alternative to the fraud-based claims above) compensatory damages for Defendants' negligent misrepresentation;

h. award (in the alternative to the breach of contract claim above) rescission of the annuity contracts, restitution and/or disgorgement of Clear Spring's, Gainbridge's, and/or Walter's unjust enrichment;

i. award pre- and post-judgment interest, costs, and reasonable attorneys' fees; and

j. grant such further relief as the Court deems just.

234. Plaintiff demands trial by jury on all issues so triable.

Dated: October 12, 2026

s/ Michael R. Limrick
Andrew W. Hull
Michael R. Limrick
**HOOVER HULL TURNER LLP**
111 Monument Circle, Suite 4400
Indianapolis, IN 46204
Telephone: 317-822-4400
awhull@hhtlaw.com
mlimrick@hhtlaw.com

George A. Zelcs (*pro hac vice* forthcoming)
Chad E. Bell (*pro hac vice* forthcoming)
**KOREIN TILLERY LLC**
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
cbell@koreintillery.com

Stephen M. Tillery (*pro hac vice* forthcoming)
Michael E. Klenov (*pro hac vice* forthcoming)
**KOREIN TILLERY LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
Facsimile: 314-241-3525
stillery@koreintillery.com
mklenov@koreintillery.com

*Attorneys for Plaintiff and the Proposed Class*